T.C. Memo. 2011-188

UNITED STATES TAX COURT

MARK E. AND PATTI L. BLACKWELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29287-09.              Filed August 8, 2011.

<u>Thomas M. Regan</u> and <u>Benjamin A. Wagner</u>, for petitioners.

<u>William R. Peck</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes for 2005 and 2006 in the
respective amounts of $46,504 and $34,500.

The issue for decision is whether petitioners' horse
breeding activity constituted an activity carried on for profit

under section 183.[1]  The trial was held on March 3, 2011, in St.
Paul, Minnesota.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  At
the time the petition was filed, petitioners resided in
Minnesota.

Petitioner Mark Blackwell (Mark) has an M.B.A. degree and 30
years of significant experience in business management.

In the early 1970s Mark was a motocross racer and
instructor.  He participated in national and international
motocross racing events, and in 1971 he was national motocross
champion.  Mark established the first motocross drivers' school
for Suzuki.

From the late 1970s through the present time Mark has had a
successful business career as manager and senior officer for a
number of motorcycle, snowmobile, ATV, and personal watercraft
manufacturing companies--for Suzuki as instructor and manager of
a winning professional motocross racing team, including six
national championships, and as head of Suzuki's motorcycle and
ATV division; for Husqvarna Motorcycle Co.; for Arctic Cat; and

---

[1]All section references are to the Internal Revenue Code in
effect for the years in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.

for Polaris Industries, manufacturer and seller of, among other things, Victory motorcycles.

At these various jobs Mark typically worked over 40 hours a week.

In the mid-to-late 1980s, while working full time, Mark completed his college degree and earned an M.B.A. from Pepperdine University. Over the years Mark has participated in a number of executive management programs, such as a business strategy course at the Wharton School at the University of Pennsylvania.

Petitioner Patti Blackwell (Patti) has a college degree in nursing. During 2000, 2001, and 2002 Patti did not work, apart from her involvement in the horse activity described below. Beginning in 2003 Patti worked approximately 30 hours a week as a rehabilitation nurse counselor for the State of Minnesota, generally working out of the family residence.

In 2003 through 2009 petitioners' salaries from their above employment were as follows:

| Year | Mark | Patti | Total |
|------|------|-------|-------|
| 2003 | $1,187,118 | $36,157 | $1,223,275 |
| 2004 | 585,923 | 47,622 | 633,545 |
| 2005 | 646,579 | 43,820 | 690,399 |
| 2006 | 479,091 | 50,163 | 529,254 |
| 2007 | 904,971 | 56,780 | 961,751 |
| 2008 | 474,279 | 54,433 | 528,712 |
| 2009 | 311,997 | 59,043 | 371,040 |

Mark did not grow up around farm animals or horses and learned how to ride horses on family vacations.

Patti grew up around farm animals and horses and always dreamed of owning and raising horses.

In 1993 petitioners purchased their first horse, and from then until 2000 petitioners purchased a number of additional horses; read books and magazines, including the Quarter Horse Journal, Quarter Horse News, and the Reiner magazine; and watched videos about horse management and breeding, bloodlines, and horse operations. Petitioners also attended a number of national horse shows.

In the mid-1990s petitioners developed an interest in starting up an activity of purchasing, breeding, and training horses.

In approximately 1996 Patti enrolled in the Equine Industry Management bachelor's degree program at the University of Minnesota. In that program Patti took courses relating to the health care, showing, judging, breeding, bloodlines, and training of horses; the management of a horse activity as a business; and the economic aspects of horse breeding and training. In that program Patti in 1998 received another bachelor's degree magna cum laude.

By the late 1990s, as a result of their reading and research, their conversations with horsemen, and a number of

training programs they had participated in relating to horse breeding and training, petitioners' interest became focused on western performance horses; namely, reining and cutting horses and working cow horses.

In 1999, in further preparation for starting up their horse breeding and training activity, Mark, with Patti's assistance, prepared a detailed business plan relating to the purchase, breeding, training, showing, and sale of reining horses. The business plan included sections entitled "Executive Summary", "Market Overview", "Advertising and Promotion", and "Proforma Income Statement".

The business plan stated that Patti would act as the barn and breeding manager and would be responsible for the health, care, nutrition, and training of the horses, and that Mark would be responsible for the business and marketing side of the horse activity.

In the business plan, the proforma income statement projected estimated losses for 2000 and 2001 of $24,000 and $7,000 and estimated profits for 2002 through 2005 of $3,000, $33,000, $48,000, and $68,000, respectively. The estimated profits were based on projections petitioners made of breeding fees and horse sale proceeds.

Beginning in 2000, on their horse ranch property in Delano, Minnesota, on which petitioners' family residence also was

located, petitioners began an American Quarter Horse breeding activity and training activity under the name of Fresh Horses Farm (FHF) with the objective of purchasing, breeding, training, and selling reining horses. As planned, Patti was in charge of the horses, and Mark was responsible for the business and marketing side of the horse activity.

Generally, petitioners sought to purchase quarter horses that had already had some success in regional horse shows and/or that had recognized bloodlines.

Patti, with some advice from Mark, would make the decisions as to which horses to purchase. Patti and Mark jointly would decide which stallions to hire to breed with their mares and whether and when to sell their horses.

During the years in issue petitioners did not hire anyone to manage their horse activity. Patti typically spent 15 to 20 hours a week taking care of the horses, and Mark spent 2 to 5 hours a week in the horse activity.

Each day Patti would feed the horses, groom them, exercise them, turn them out, and clean out the horse stalls.

With her training in medicine and to avoid additional expenses, Patti did much of the health maintenance on the horses

without hiring a veterinarian.  Patti vaccinated and dewormed the horses.  She did the "foal watch" and would assist in the delivery of the foals.[2]

In connection with their FHF horse activity, petitioners maintained a bank account under the name of FHF, and petitioners used BarnPro, a recognized horse farm software program, to record and keep track of FHF income and expenses.

In connection with their ownership of horses and the activities of FHF, one or both of petitioners were members of the following horse organizations:  American Quarter Horse Association (1993 to present), National Reining Horse Association (1998 to present), North Central Reining Horses Association (1998 to present), National Cutting Horses Association (2006 to 2010), and Minnesota Cutting Horses Association (2006 to 2010).

Both Mark and Patti occasionally rode their horses in horse shows, won some nominal prize money, and participated in social events at horse shows.

In 2002 and later years petitioners sought and received advice on their FHF horse activity from a number of expert horsemen, including Bob Janssen of Janssen Performance Horses, a nationally recognized horse trainer.

---

[2]"Foal watch" consists of 24-hour observation of a mare about to deliver a foal.

Over the years petitioners advertised their horses on their own FHF Web site, on business cards, calendars, clothing, flyers, and in videos and magazine articles.

Occasionally petitioners would hire professional horse trainers to work with their horses and to show or ride their horses in horse shows.

In 2006 petitioners shifted their horse breeding and training activity from reining horses to cutting horses because by 2006 cutting horses were in greater demand in the horse industry.

At one point petitioners began trying to sell some of their horses as long yearlings to avoid horse training expenses they would incur if they kept the horses longer.

Petitioners purchased three horses in 1998, one horse in 1999, three horses in 2000, one horse in 2003, one horse in 2004, one horse in 2005, three horses in 2007, and two horses in 2008. All but four of the horses petitioners eventually sold were sold at a loss, three were sold at a small profit over petitioners' purchase price (not taking into account expenses relating to the horses), and one died for which petitioners received an insurance payment. The schedule below provides some detail about the horses petitioners purchased and sold:

| Horse Name | Year Purchased | Purchase Price | Selling Price | Year Sold |
|---|---|---|---|---|
| Glo Jessie Glo | 1998 | $12,500 | $7,500 | 2002 |
| Calico Catalyst | 1998 | 12,500 | 7,000 | 2003 |
| ZF Zap Em | 1998 | 2,000 | 3,200 | 2001 |
| Dunitz Midnight Glo | 1999 | 5,000 | 3,750 | 2003 |
| Miss Bessie Westwind | 2000 | 20,000 | 15,000 | 2007 |
| CeeCee Pauli | 2000 | 13,000 | 5,500 | 2002 |
| Sheza Chexy DunIt | 2000 | 11,000 | 15,000 | 2003 |
| Smart Little Dun It | 2003 | 25,000 | 15,000 | 2007 |
| Smart Chic Hoo Does | 2005 | 15,000 | 15,000 | 2005 |
| Sweet Sugar Boon | 2007 | 30,000 | 8,300 | 2010 |
| U Neek Hickory | 2007 | 11,000 | 6,100 | 2010 |
| Lenas Lucky Chic | 2007 | 1,000 | 4,000 | 2008 |
| Memphis Chic | 2008 | 3,500 | 1,500 | 2008 |
| To Smart Lil Juice | 2008 | 15,000 | 9,800 | 2009 |

Petitioners purchased the following five additional horses which, as of the date of trial, either had died or were still owned by petitioners:

| Horse Name | Year Purchased | Purchase Price | Year Died | Petitioners Still Own |
|---|---|---|---|---|
| Dudes Jackie May | 1993 | $2,000 | 2007 | --- |
| Sonata Starlight | 2004 | 48,000 | [1]2007 | --- |
| Smart Chicaway | 2006 | 30,000 | --- | Yes |
| High Brow Madonna | 2007 | 15,000 | --- | Yes |
| Jodies BH | 2000 | 16,000 | --- | Yes |

[1]When Sonata Starlight died unexpectedly in 2007 from colic, petitioners received a $48,000 insurance payment.

From 1999 through 2008 petitioners acquired and sold 21 additional horses which petitioners acquired by breeding their mares to outside horses, for which stud services petitioners paid fees. The resulting foals, after being raised and trained for a period by petitioners, were sold by petitioners as follows:

| Birth Year | Horse Name | Stud Fee | Selling Price | Year Sold |
|---|---|---|---|---|
| 1999 | Dunitz Fresh Dude | $300 | $5,000 | 2002 |
| | Jessies Gotta Whiz | 2,500 | 4,000 | 2003 |
| | Arcticatalyst | 300 | 7,600 | 2002 |
| 2000 | Fresh N Dun | 300 | 1,000 | 2001 |
| | Get Fresh With Me | 3,000 | 7,000 | 2001 |
| | Freshinic | 750 | 1,700 | 2003 |
| 2001 | Fresh Champagne | 500 | 3,000 | 2002 |
| | Fresh Victory | 2,500 | 2,800 | 2002 |
| | A Farm Fresh Chic | 2,000 | 5,000 | 2006 |
| | Mid West Whiz | 1,500 | 12,500 | 2004 |
| 2002 | Over the Reinbow | 2,500 | 2,750 | 2004 |
| | To The Moon | 500 | 2,000 | 2004 |
| 2003 | Foxy Cleopatra | 372 | 1,000 | 2005 |
| | After Midnight | 771 | 3,400 | 2005 |
| | Lil Ruf Shagwell | 3,050 | 9,800 | 2009 |
| 2004 | Ruf Talkin Dunit | 1,500 | 50,000 | 2007 |
| 2005 | Chics Big Star | ([1]) | 25,000 | 2006 |
| 2006 | Smart Lil Miss | 6,000 | 8,000 | 2007 |
| | Starry Eyed Chic | 11,000 | 11,000 | 2009 |
| 2007 | Fresh Juice | 1,291 | 6,600 | 2009 |
| | Little Wrangler | 4,500 | 1,550 | 2009 |
| | Sonatas Rock Star | ([2]) | 2,200 | 2010 |
| 2008 | Boonalicious | 18,000 | 6,500 | 2009 |
| Total | | 63,134 | 179,400 | |

[1]The foal Chics Big Star was purchased in utero.

[2]Petitioners incurred no stud fee for Sonatas Rock Star as their mare was bred with one of their own stallions.

A horse (Smart Chicaway) that petitioners purchased in 2006 for $30,000 and which petitioners still own has sired a number of horses--all owned by others--which horses have won a number of

horse cutting competitions and have earned a total of $27,998 in winnings for their owners in events sponsored by the National Cutting Horse Association and a total of $22,952 in winnings in events sponsored by the National Reining Horse Association.

Petitioners still own a horse called Starbucks Fresh Brew which petitioners acquired through breeding one of their mares for a stud fee of $1,500.

Petitioners believed that two particular horses--Smart Lena and Sonata Starlight--that petitioners purchased in 2003 and 2004 had the potential (with the right breeding) to produce foals that would have bloodlines attractive on the national horse market.

Petitioners' horse activity was marred by a number of illnesses their horses experienced. The sudden and unexpected death of Sonata Starlight in 2007 was a major setback to petitioners' plans to have successful and profitable breeding mares that would produce foals that would eventually be sold at the national level.

Petitioners propose, respondent does not object to, and we find the following additional facts:

> Petitioners believed in 2004 they had a broodmare band which would allow them to sell their foals at the national level. They hoped the sale of Sonata's foal would recoup much of FHF's investment.

> At one point two of petitioners' horses were shipped to Missouri for sale with the hope of selling each horse for $15,000. Because of a softening of the horse market, the horses were each sold for less than one-half of the price expected.

One of petitioners' foals (Boonalicious) was a filly by a leading cutting stallion. Boonalicious' stud fee was $15,000. Petitioners were optimistic about their prospects with this filly.

Petitioners hired an experienced horseman to fit and present Boonalicious at the National Reined Cow Horse Futurity in Reno, Nevada. They understood that the horseman was the best of the best. They were devastated when they received only $6,500 for the horse, less than 10 percent of what similar horses had sold for in prior years and what they thought she was worth.

Petitioners consulted all the experts and did everything the experts told them to do, but finally in 2009 petitioners determined that their FHF horse business was not sustainable.

Petitioners kept track of the income and expenses of their FHF horse activity by making entries into their BarnPro horse management farm software.

Annually, petitioners prepared a summary report of their expenses involving their ownership of horses and FHF's activities.

In 2009, because of the losses they continued to experience, petitioners terminated their horse breeding activity.

On the Schedules C, Profit or Loss From Business, attached to their 2003 through 2009 Federal income tax returns, petitioners reported gross income, total expenses (including depreciation), net operating losses, and gain from the sales of business property (Form 4797 gain), relating to their FHF horse activity, as follows:

| Year | Gross Income | Total Expenses | Net Operating Loss | Form 4797 Gain |
|------|-------------|----------------|--------------------|----------------|
| 2003 | $1,011 | $69,468 | ($68,457) | $18,934 |
| 2004 | 3,106 | 90,809 | (87,703) | 17,250 |
| 2005 | 10,020 | 132,416 | (122,396) | 4,152 |
| 2006 | 30,870 | 123,217 | (92,347) | -0- |
| 2007 | 67,420 | 148,286 | (80,866) | 46,373 |
| 2008 | 7,952 | 133,270 | (125,318) | -0- |
| 2009 | 46,261 | 108,811 | (62,550) | -0- |
| Total | 166,640 | 806,277 | (639,637) | 86,709 |

On the Schedules C attached to their 2005 and 2006 Federal income tax returns, petitioners claimed the following business expenses relating to their FHF horse activity:

| Expense | 2005 | 2006 |
|---------|------|------|
| Advertising | $1,840 | $3,505 |
| Commission/fees | 562 | 3,752 |
| Depreciation | 29,482 | 22,738 |
| Insurance | 3,610 | 4,529 |
| Repairs/maintenance | 327 | --- |
| Supplies | 1,388 | 202 |
| Board | 7,910 | 4,191 |
| Breeding | 25,061 | 11,892 |
| Farrier | 3,284 | 4,701 |
| Feed hay | 5,395 | 5,580 |
| Health maintenance | 7,147 | 2,581 |
| Membership | 525 | 210 |
| Miscellaneous | --- | 140 |
| Shavings | 1,026 | 1,225 |
| Show expense | 13,540 | 10,282 |
| Training | 14,849 | 32,132 |
| Tack | --- | 509 |
| Transportation | 1,520 | 620 |
| Vet | 14,950 | 14,428 |
| Total | 132,416 | 123,217 |

On audit for 2005 and 2006 respondent determined that petitioners' FHF horse activity did not qualify as an activity engaged in for profit, and respondent disallowed deductions for

all of the reported business expenses in excess of income received.

## OPINION

Under section 183(a) and (b), if an activity is not engaged in for profit by a taxpayer the deductions claimed by the taxpayer relating to the activity are not allowed except to the extent of income received from the activity. To be treated as "engaged in for profit" an activity must be carried on by the taxpayer with an actual and honest profit objective. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

Activities carried on primarily for sport, hobby, or recreation do not qualify as for-profit activities. Sec. 1.183-2(a), Income Tax Regs.

Whether a taxpayer has the requisite profit objective with respect to an activity is a question of fact that is to be decided on the basis of all the evidence in a case. Generally, the taxpayer bears the burden of proving that he or she carried on the activity with a profit objective.[3] Rule 142(a).

In deciding this question, regulations under section 183 set forth a nonexclusive list of nine factors which generally are

_____

[3]Petitioners do not argue for a shift of the burden of proof to respondent under sec. 7491(a).

considered and which we discuss below.  Sec. 1.183-2(b), Income Tax Regs.

## Manner in Which the Activity Is Carried On

Petitioners generally carried on their FHF horse activity in a reasonably businesslike manner.  During the 1990s petitioners prepared to start up a horse breeding and training activity by taking educational courses relating to the care, management, breeding, and economics of horses, and by purchasing, caring for, training, and selling a number of horses.  Petitioners developed a rather comprehensive written business plan relating to the proposed horse activity.

Beginning in 1994 petitioners took 6 or 7 years learning about horse breeding and management before attempting to engage in a for-profit horse breeding activity.  In Mark's words:  "[W]e were pretty cautious, so we didn't jump into it.  We just kept trying to learn and figure out is this a business that we could * * * be in and be successful, and it took us some time to make the final decision to get in."

Once petitioners started up their FHF horse activity in 2000 and during the years in issue, petitioners were not absentee, aloof, or recreational horse owners.  Patti managed and worked diligently and daily on the horse activity, doing essentially all of the horse maintenance herself.  Petitioners consulted expert horsemen, hired expert horse trainers to assist in training the

horses, advertised, showed the horses, and paid significant stud fees to have their mares bred with stallions which they regarded as having good bloodlines.

In their efforts to make improvements to the horse activity, petitioners made adjustments in their business plan, moving from reining horses to cutting horses and selling their horses as yearlings.

Petitioners maintained reasonably good books and records of income and expenses relating to their horse activity.

In 2009 petitioners terminated their unprofitable horse activity in light of the losses realized.

Expertise of the Taxpayer

Through Patti's experience with and her education relating to horses and through Mark's business experience, petitioners were reasonably well qualified to engage in a horse breeding activity for profit. Mark's business qualifications were particularly strong and he had a gifted ability to make good business decisions, to market and advertise effectively, and to work successfully with others.

Time and Effort Expended in Carrying On the Activity

The time, effort, and financial resources petitioners personally put into and invested in their FHF horse activity are not indicative of a hobby; rather, they are indicative of a for-

profit activity. Of the time petitioners spent with the horses, most of it was daily hard work.

Expectation That the Horses May Appreciate in Value

Petitioners certainly had the expectation, and acted thereon, that at least some of their horses would become valuable as reining or cutting horses or as valuable mares or stallions with recognized bloodlines with significant value for breeding purposes.

Success in Other Activities

Patti's degree from the University of Minnesota relating to horse management indicates some likelihood of success and a high commitment to petitioners' horse activity.

Mark's obvious business acumen and success in business development and management with other companies, along with petitioners' credible testimony, indicate, to us, an ability, determination, and savvy to make a profit and be successful in petitioners' horse activity.

History of Income or Losses

A series of losses during the startup period of an activity is not necessarily an indication that the activity is not engaged in for profit, bearing in mind, however, that the objective must be to realize a profit on the entire operation--future net earnings and also enough earnings to recoup losses that have been incurred in intervening years. Bessenyey v. Commissioner, 45

T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); <u>Emerson v. Commissioner</u>, T.C. Memo. 2000-137.

We note that in 2006, 2007, and 2009 petitioners did receive significant gross income from their horse activity ($30,870, $67,420, and $46,261, respectively), although not what petitioners hoped for.

The bottom line losses realized in petitioners' horse activity were substantial. However, the losses were realized during what we, in this case, regard as still the early or startup years of the activity, and petitioners terminated the horse activity in 2009 when it became clear to petitioners that the likelihood of profitability was remote.

<u>Amount of Occasional Profits</u>

An opportunity to earn a substantial ultimate profit in a highly speculative venture may be sufficient to indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(7), Income Tax Regs. Horse breeding and training is a speculative venture. Petitioners have convinced us that they had an opportunity or the potential to earn a profit in their FHF horse activity.

<u>Financial Status</u>

Petitioners did have substantial wealth and resources not related to their horse activity, but in light of the minimal recreational aspects of petitioners' horse activity, we do not

regard petitioners' wealth as indicative of a nonprofit objective for petitioners' horse activity.

## Elements of Personal Pleasure

Although Patti had a lifelong interest in horses, the facts of this case do not indicate that petitioners' FHF horse activity was motivated or driven by personal pleasure alone. As we have found, petitioners had actual hopes for the sale of their horses at a profit, and petitioners' horse activity is appropriately described as a "business".

Petitioners' business plan did not work out and income did not exceed expenses, but we discern few recreational and sports aspects in petitioners' FHF horse activity; rather, in petitioners' motive, efforts, and investment in carrying on their FHF horse activity during the years in issue we discern and find a profit objective. We so hold.

Decision will be entered for petitioners.