T.C. Memo. 2012-17

UNITED STATES TAX COURT

PETER C. AND CAROLYN P. BRONSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17478-08, 26463-08.   Filed January 17, 2012.

Peter C. and Carolyn P. Bronson, pro sese.

<u>Alan Edward Staines</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  These cases were consolidated for trial,
briefing, and opinion.  Respondent determined deficiencies in
petitioners' Federal income taxes for 2001, 2002, 2003, 2004, and
2005 of $22,905, $31,565, $28,165, $32,664, and $34,033,
respectively, in two notices of deficiency that were separately

petitioned.[1]  Respondent also determined an addition to tax under

section 6651(a)(1)[2] of $1,629 for 2002 and penalties under

section 6662 of $6,533 and $6,807 for 2004 and 2005,

respectively.

After concessions,[3] the issues for decision are:  (1)

Whether petitioners' horse-related activity (horse activity) was

an "activity not engaged in for profit" within the meaning of

section 183 during the years at issue[4] and (2) whether

petitioners are liable for penalties under section 6662 for 2004

and 2005.

---

[1]Certain computational adjustments, including adjustments to petitioners' alternative minimum tax liability, were also made.

[2]All section references are to the Internal Revenue Code of 1986, as in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[3]Respondent concedes that petitioners are not liable for the sec. 6651(a)(1) addition to tax for 2002.  Petitioners concede that they failed to report $4,221 in capital gains for 2001. Respondent also determined that petitioners are liable for self-employment taxes in connection with the conduct of the horse activity.  Given our holding (discussed infra) that the horse activity was "an activity not engaged in for profit" within the meaning of sec. 183, the activity could not have given rise to any self-employment tax liability for the years at issue. Respondent's treatment of a $642 capital loss deduction petitioners claimed for 2005 is unclear from the notice of deficiency.  We expect the parties to address these issues as part of their Rule 155 computations.

[4]Although the notices of deficiency do not refer to sec. 183, the parties have both consistently framed petitioners' entitlement to the deductions at issue as turning upon the applicability of that section.  We accordingly conclude that each has waived any other grounds for denying or supporting the claimed deductions.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petitions were filed, petitioners resided in California.

Petitioners are married and filed joint Federal income tax returns for each of the years at issue. Petitioner Carolyn P. Bronson (Dr. Bronson) holds a Ph.D. in consumer finance and has taught consumer economics at the college level. During the years at issue Dr. Bronson held a real estate license but was not working as a real estate broker or otherwise. Petitioner Peter C. Bronson (Mr. Bronson) was a practicing attorney specializing in bankruptcy litigation. Petitioners had three daughters during the years at issue, the eldest born in 1990 and twins born in 1995. Petitioners resided in Los Angeles County from 2001 until August 2005, when they moved to Nevada County, California.

Before starting the horse activity, neither petitioner had experience breeding horses and neither was certified or qualified as a trainer, veterinarian, or farrier. Dr. Bronson held no outside gainful employment during the years at issue although she was involved at some point before 2001 in managing the operations of an 85-acre cooperative equestrian barn which provided boarding services. She devoted substantial time during the years at issue to the horse activity. Mr. Bronson practiced law full time and

was much less involved with the horse activity. Petitioners' daughters rode some of petitioners' horses recreationally and in shows; petitioners themselves did not ride.

Petitioners became interested in Welsh ponies and cobs[5] in 1995 when their then only daughter began riding lessons on a Welsh pony. Later that year petitioners purchased a Welsh pony gelding[6] for their daughter's use. Thereafter, Dr. Bronson became active in Welsh pony and cob circles. She consulted a number of individuals who trained and bred Welsh ponies and cobs regarding their operations and became involved with national and regional breeders' organizations.

In 1998 petitioners purchased their second horse, a half-Welsh mare, and began treating the horse activity as a trade or business which they referred to as Coldstream Farm. Petitioners did not prepare a written business plan before starting Coldstream Farm.[7] However, Dr. Bronson testified that their original plan was to acquire, breed, and train high-quality Welsh

_____

[5]Welsh ponies and cobs are closely related horse breeds that are categorized according to size and may be suitable for children or adult riding.

[6]A gelding is a neutered male horse.

[7]In 2002 petitioners created a document which included a "Mission Statement" and a "Five-Year Plan". The document retroactively summarizes petitioners' annual goals for Coldstream Farm from 1998 through 2002 and provides the results achieved in pursuit of those goals from 1998 through 2001. The document has not been revised since it was created.

ponies and cobs and sell them.[8]  Petitioners treated the mare and the gelding purchased for their daughter as assets of the business and began reporting the operating results of Coldstream Farm on a Schedule C, Profit or Loss From Business, attached to their Federal income tax return for 1998.

Petitioners did not own property suitable for housing their horses or supporting their horse activity when they started Coldstream Farm.  Consequently, they paid to board their horses with third-party providers.  In 1999, after reviewing the expenses of the horse activity, petitioners determined they needed to acquire their own facility in order to diversify their offerings and control costs.  Dr. Bronson toured a number of horse farms and further determined that the small margins associated with the horse business made it important to have a facility at which petitioners could conduct breeding, boarding, training, and sales activities.  Despite these conclusions, petitioners did not acquire land for their own facility until 2005.

In the meantime, petitioners continued to acquire horses. They purchased four horses and foaled two others in California

---

[8]Notably, the only breeding or training records petitioners offered into evidence were two undated "stock summaries" that listed general information about their horses such as date of birth, acquisition date and price, parentage, and a brief description of the discipline in which each horse had been trained.

between 2000 and 2002. Petitioners also purchased two horses located in Wales, one each in 2001 and 2002, imported them, and boarded them on the east coast.[9] One of the east coast horses delivered a foal in 2003. So far as the record reveals, petitioners owned 10 horses by the end of 2003 and through 2005, the last year at issue. Seven of the horses were located in southern California and the other three on the east coast. Petitioners paid to board all 10 horses.

Petitioners began searching for their own equine facility in 2001 by investigating properties near their Los Angeles County home.[10] When it became clear that restrictive zoning ordinances and high land costs in Los Angeles County were substantial obstacles to petitioners' finding affordable property for housing an equine facility, petitioners focused their search on neighboring Ventura County.

Dr. Bronson spent a significant amount of time reviewing real estate listings, talking to brokers, researching zoning laws, making telephone calls, and visiting and investigating

---

[9]The record is not clear regarding why these horses were boarded on the east coast. Dr. Bronson testified that the horses would be moved to California when petitioners' equine facility was completed. These horses were shown at horse shows on the east coast.

[10]That same year the Internal Revenue Service completed an examination of Coldstream Farm's activities as reported on petitioners' 1999 Federal income tax return. The examining agent did not make any adjustments.

various properties. Over time petitioners identified a number of potentially suitable properties in southern California, many of which contained equine facilities. However, petitioners discovered flaws in most of the identified properties and did not pursue them further.

From the time their search began in 2001 through the spring of 2005, petitioners submitted offers on only two properties. Petitioners were substantially outbid on one and walked away from the other during the due diligence process after discovering problems with settlement and the proximity of earthquake fault lines.

In the spring of 2005 petitioners expanded their search and began looking for property in northern California. Dr. Bronson researched Nevada County and believed it would be suitable for petitioners' horse activity. Mr. Bronson's law firm had connections in the Sacramento area and was amenable to Mr. Bronson's opening a Sacramento office. In May 2005 Dr. Bronson met with two real estate brokers and viewed a number of properties in Nevada County. During that visit Dr. Bronson toured a 40-acre property in western Nevada County in which petitioners became interested.

The property had a residence but no equine facility. Before making an offer, petitioners hired a developer to evaluate the property's suitability for housing an equine facility and an

agriculturist to test the soil. Petitioners also hired a group of engineers to plan the design and construction of a barn and arenas on the property. Satisfied they would be able to construct their desired facility, petitioners purchased the property and moved to Nevada County in August 2005.

Petitioners hired River City Construction, a Sacramento-area contractor, to fence the property and to build and install various aspects of petitioners' desired facility. Construction began in 2006 but did not go as planned. Petitioners claim that much of River City's work was substandard and that they paid River City a substantial sum for work that was never done. A lengthy dispute ensued; Mr. Bronson testified that petitioners were preparing to sue the two individuals who operated River City when both filed chapter 7 bankruptcy petitions in January of 2009.

In April 2009 petitioners filed a complaint in each bankruptcy proceeding seeking nondischargeability of the debt petitioners claim the contractors owe them, and monetary damages. The litigation had not concluded at the time of trial in these cases. Petitioners' facility has not been completed. However, 8 of the 13 horses petitioners owned at the time of trial were kept at petitioners' property; the other 5 were boarded on the east coast.

Dr. Bronson has been involved in various breeders'
organizations and civic groups throughout the duration of
petitioners' horse activity. She also wrote an equestrian column
for a local newspaper and sponsored a summer riding clinic for
at-risk teenage girls. Petitioners claim the purpose of Dr.
Bronson's involvement in such activities was to establish the
Coldstream Farm brand and build credibility in the equestrian
community.

Petitioners also advertised to raise awareness of their
operation and offer specific horses for sale. Petitioners paid
to place print ads in national and regional equine publications
and advertised locally by posting flyers on bulletin boards at
horse shows they attended. Petitioners claimed advertising
expense deductions of $3,339,[11] $1,575, $695, $170, and $325 for
2001, 2002, 2003, 2004, and 2005, respectively.

Petitioners' horse activity did not generate significant
revenue. Petitioners' lone sale of a horse during the years at
issue occurred in 2003 when they sold Flying Satellite, a gelding
they purchased in 2000, to a nonprofit organization for $500. On
their 2003 return, petitioners took the position that Flying
Satellite was worth $5,500 at the time of sale and claimed a

---

[11]Petitioners' advertising expenses for 2001 included $1,312
petitioners spent on airfare and a rental car for a trip they
characterized as promoting a horse and $862 petitioners spent on
a digital camera. Respondent has not challenged the propriety of
these claimed expense deductions on grounds other than sec. 183.

$5,000 charitable contribution deduction in connection with the transfer to the nonprofit organization.[12] After the years at issue, in 2007, petitioners sold two horses that they bred in California, for $6,500 and $10,000, respectively. The only other income petitioners reported from the horse activity through 2008 was insubstantial.

In contrast to reported income, the horse activity's expenses were substantial. Petitioners deducted boarding expenses of $18,733, $33,025, $39,345, $28,971, and $37,702 for 2001, 2002, 2003, 2004, and 2005, respectively. For those same years petitioners' claimed training expense deductions were $3,467, $5,530, $10,956, $31,747, and $19,571, respectively. Petitioners also claimed significant depreciation,[13]

---

[12]The parties stipulated that Flying Satellite was sold for $5,550, but they also stipulated a letter to petitioners from the nonprofit organization stating that the organization had paid petitioners $500 for Flying Satellite and had accepted petitioners' contribution of the balance of the horse's purported value, i.e., $5,000. The record does not illuminate the basis for the $50 discrepancy. Petitioners reported $5,550 in receipts, $2,171 in cost of goods sold, and $3,379 of gross income on Schedule C of their 2003 Federal income tax return. Petitioners also reported a cash gift of $5,000 to the nonprofit organization that purchased Flying Satellite and claimed a corresponding $5,000 charitable contribution deduction on Schedule A, Itemized Deductions, of their 2003 return. Respondent has not challenged petitioners' reporting of the transaction.

[13]In 2001, 2002, and 2003 petitioners apparently depreciated horses they offered for sale; however, respondent has not challenged petitioners' depreciation deductions on grounds other than sec. 183. See sec. 1.167(a)-2, Income Tax Regs.

transportation, and veterinary expense deductions for the years at issue.

Petitioners maintained expense records for the horse activity in spreadsheet form. The records identified and categorized individual expenditures for all 5 years at issue. Most expenditures were partly related to the horse activity and partly related to petitioners' personal activities. Both the full amount of each expenditure and the amount related to the horse activity were recorded. Petitioners prepared no other financial statements for Coldstream Farm.

Petitioners' accountant found their records adequate for purposes of their income tax reporting. However, he did not have any expertise regarding horses, and there is no evidence that petitioners sought or received his advice concerning whether their deductions for expenses of the horse activity were subject to restriction under section 183.

Petitioners have never reported a profit from the horse activity. From the time petitioners started Coldstream Farm in 1998 through 2008, petitioners claimed a cumulative net loss of $837,752. Petitioners used the horse activity losses to offset substantial earnings from Mr. Bronson's law practice in most years.[14] The following table summarizes the net losses generated

_____

[14]For the first 2 full years after petitioners moved to Nevada County (2006-2007) Mr. Bronson's net income from his law

(continued...)

by the horse activity and, where available from the record, the
gross receipts from the horse activity and Mr. Bronson's law
practice net income from 1998 through 2008.

| Year | Net Income From Mr. Bronson's Law Practice | Gross Receipts From Horse Activity | Net Income (Loss) From Horse Activity |
|------|------|------|------|
| 1998 | N/A[1] | N/A[1] | ($24,112) |
| 1999 | N/A[1] | N/A[1] | (53,508) |
| 2000 | N/A[1] | N/A[1] | (33,152) |
| 2001 | $339,500 | -0- | (55,721) |
| 2002 | 260,000 | $320 | (82,254) |
| 2003 | 235,000 | 5,550 | (80,718) |
| 2004 | 331,500 | -0- | (90,290) |
| 2005 | 180,000 | -0- | (98,773) |
| 2006 | 30,011 | -0- | (94,213) |
| 2007 | (8,284) | 17,170 | (93,180) |
| 2008 | 327,567 | 3,574 | (131,831) |

[1]Not available from record.

Respondent disallowed the Schedule C expense deductions
petitioners claimed from the horse activity for the years at
issue on the grounds that the expenses were not incurred for
ordinary or necessary business purposes, resulting in a

---

[14](...continued)
practice declined precipitously from an average of $291,500 for
the 4 years preceding the move year to an average of less than
$11,000 for 2006-2007.  His law practice net income for 2008 was
$327,567.

deficiency for each year.[15]  Petitioners timely petitioned this Court for redetermination of the deficiencies.

OPINION

I.  Horse Activity

The principal issue to be decided in these cases is whether petitioners' horse activity was engaged in for profit during the years at issue.  Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."  Deductions are allowable under sections 162 and 212 for activities in which the taxpayer engaged with the predominant purpose and intention of making a profit.  Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner, 72 T.C. 28, 33 (1979).  Generally, individuals are allowed to deduct expenses attributable to an activity not engaged in for profit only to the

_____

[15]The parties agree that petitioners' entitlement to deductions for the expenses claimed on the Schedules C depends upon whether the horse activity was not engaged in for profit within the meaning of sec. 183.

extent of gross income generated from the activity.[16]  Sec.
183(a), (b)(2).

Thus, it is the taxpayer's subjective intent to earn a
profit that determines the deductibility of an activity's losses.
Skeen v. Commissioner, 864 F.2d 93, 94 (9th Cir. 1989), affg.
Patin v. Commissioner, 88 T.C. 1086 (1987); Dreicer v.
Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702
F.2d 1205 (D.C. Cir. 1983).  While the taxpayer's subjective
intent is the test, objective criteria are used to establish that
intent, including those listed in section 1.183-2, Income Tax
Regs.  Skeen v. Commissioner, supra at 94.  A taxpayer's
expectation of profit need not be reasonable, but the objective
facts and circumstances must indicate that the taxpayer entered
into or continued the activity with the actual and honest purpose
of making a profit.  Dreicer v. Commissioner, supra at 645.  "The

_____

[16]Sec. 183 does not restrict deductions that are allowable
without regard to whether the activity is engaged in for profit.
Sec. 183(b)(1).  Where deductions are allowable under sec.
183(b)(1), deductions under sec. 183(b)(2) are limited to the
amount by which gross income derived from the activity exceeds
deductions allowable under sec. 183(b)(1).  No sec. 183(b)(1)
expenses are at issue in these cases.  However, it appears that
respondent's determinations for 2002 and 2003 failed to allow
expenses to the extent of horse-activity income, as provided in
sec. 183(b)(2).  We expect the parties to address this issue in
their Rule 155 computations.

burden of proving the requisite profit motive is on the taxpayer." Skeen v. Commissioner, supra at 94.[17]

Further, "the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in intervening years." Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965); see also Golanty v. Commissioner, supra at 427. Evidence from years subsequent to the years at issue is relevant to the extent it creates inferences regarding the requisite profit motive in earlier years. Hillman v. Commissioner, T.C. Memo. 1999-255; Hoyle v. Commissioner, T.C. Memo. 1994-592; Smith v. Commissioner, T.C. Memo. 1993-140.

As noted, section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. No single factor is determinative. These factors are: (1) The manner in which

---

[17]In their reply brief petitioners argue for the first time that respondent has the burden of proof pursuant to sec. 7491(a). Ordinarily, we do not consider issues raised for the first time in a party's reply brief. See Cordes v. Commissioner, T.C. Memo. 2002-124; see also Kansky v. Commissioner, T.C. Memo. 2007-40. In any event, our resolution of this issue is based on the preponderance of the evidence rather than the allocation of the burden of proof, so we do not consider petitioners' claim. See Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), affg. T.C. Memo. 2003-212; see also Estate of Jorgensen v. Commissioner, 431 Fed. Appx. 544, 546-547 (9th Cir. 2011), affg. T.C. Memo. 2009-66.

the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.  Sec. 1.183-2(b), Income Tax Regs.

Petitioners argue that they operated the horse activity with the principal purpose and intent of realizing a profit. Respondent contends that the manner in which petitioners operated the horse activity, and its history of consistent, substantial losses, show that petitioners lacked the requisite profit motive. We shall evaluate the evidence of profit motive with reference to the factors enumerated in the regulations.

### Manner of Carrying On the Activity

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit motive.  Sec. 1.183-2(b)(1), Income Tax Regs.  Characteristics of a businesslike operation include the preparation of a business plan and, in the case of horse breeding and sales, a consistent and concentrated advertising

program.  See Golanty v. Commissioner, supra at 431; Keating v. Commissioner, T.C. Memo. 2007-309, affd. 544 F.3d 900 (8th Cir. 2008); Dodge v. Commissioner, T.C. Memo. 1998-89, affd. without published opinion 188 F.3d 507 (6th Cir. 1999).  The regulations further provide that a profit motive is indicated when a taxpayer changes operating methods or adopts new techniques with an intent to improve profitability.  Sec. 1.183-2(b)(1), Income Tax Regs.

In petitioners' view, the decision to acquire an equine facility represents both a business plan and a change in operating method to improve profitability, as contemplated in section 1.183-2(b)(1), Income Tax Regs.  Petitioners liken their circumstances to those in Engdahl v. Commissioner, 72 T.C. 659 (1979), in which we found an intent to profit (notwithstanding 12 years of sustained losses) where the horse-breeding taxpayers likewise had commenced the activity by boarding their horses with others and only later acquired their own equine facility. Engdahl is readily distinguishable, however, in a manner that lies at the crux of this case.

The Engdahls were advised after approximately 2 years of operation that they needed their own ranch on which to board their horses in order to make their operation profitable.  Id. at 661.  After a 1-year search, the Engdahls acquired a ranch and thereafter conducted their horse activities there.  Id.

By contrast, petitioners did not proceed at any reasonable pace to acquire a facility, notwithstanding hemorrhaging losses. In 1999 petitioners concluded that the horse activity could be profitable only if they acquired a facility where they could board their horses and generate income by providing boarding and training services to others.  Although the need for their own facility was apparent in 1999, petitioners did not begin searching for one until 2001 (after their 1999 return had been examined) and did not acquire land for one until 2005, on which they commenced construction in 2006.  Meanwhile, their very substantial losses from the horse activity continued unabated. Their losses were $33,152 in 2000 and rose steadily, from over $82,000 in 2002 to almost $100,000 in 2005.

Moreover, petitioners continued to acquire horses in the years after 1999, even though they had not acquired a facility. Petitioners increased their stock from 2 horses in 1999 to 10 horses in 2005 when they finally acquired land for a facility. We believe that an actual and honest profit motive would have dictated curtailment, not expansion, of petitioners' horse population while they sought their own facility.  At the time of trial, approximately 12 years into their horse activity, petitioners were still paying to board 5 of their 13 horses on the east coast, even though their California horses were being kept at the facility.

While a reasonable search period might be countenanced, petitioners' failure even to start the search for over a year, and their continued acquisition of horses with no facility in sight, all while incurring very substantial annual losses, suggests an indifference to those losses that we are unable to reconcile with an "actual and honest objective of making a profit". Dreicer v. Commissioner, 78 T.C. at 645. We find the inconsistencies in petitioners' business plan, and their failure to adhere to it, the most significant points concerning whether they conducted the horse activity in a businesslike manner.

Petitioners' advertising was also unbusinesslike. Although petitioners placed occasional advertisements in national and regional equine publications, a method indicative of businesslike operation, petitioners' advertising efforts were insubstantial compared to the cost of the horse activity and generally declined over the years at issue despite petitioners' lack of sales. See Golanty v. Commissioner, 72 T.C. at 431. For 2004, for example, petitioners reported a $90,290 loss from the horse activity and only $170 in advertising expenses. Petitioners' other promotional efforts, including Dr. Bronson's involvement in breeders' organizations and participation in horse shows, are as consistent with a hobby as with a for-profit business.

Finally, petitioners claim that their recordkeeping indicates a profit motive because they "always recorded every

business-related expenditure individually, and have assiduously separated business-related from non-business components of even $5 and $10 expenditures."  A close examination of their records reveals a different picture.  For more than three-quarters of the expenditures that had mixed horse activity and personal components, petitioners simply allocated exactly 80 percent of the expenditure to the horse activity, suggesting that their segregation of nondeductible personal expenditures was, at best, approximate.  We also note that the depreciation schedule attached to petitioners' 2002 return lists a dog among the depreciated items, and petitioners deducted $1,144 of Schedule C expenses relating to the dog in that year.  In short, petitioners' recordkeeping was not businesslike; personal expenditures were not meticulously segregated as petitioners claim.

In any event, we have recognized that the significance of the business records factor lies in the use of such records for determining profitability and analyzing expenses, not merely to memorialize transactions for tax reporting purposes.  Keating v. Commissioner, T.C. Memo. 2007-309; Dodge v. Commissioner, supra. Maintenance of records generally does not indicate profit motive when there is a lack of evidence that the taxpayer used the records to improve the performance of a losing operation. Golanty v. Commissioner, supra at 430; Sullivan v. Commissioner,

T.C. Memo. 1998-367, affd. without published opinion 202 F.3d 264 (5th Cir. 1999). Petitioners' records indicated to them in 1999 that the horse activity would not be profitable without their own facility. As petitioners did not begin constructing a facility until approximately 7 years later in 2006, the effective use to which their records were put was minimal.

Petitioners' recordkeeping fell short of businesslike in another important respect. In the case of a horse breeding activity, the maintenance of separate records for each animal's performance (e.g., breeding results and offspring's performance) is an important factor bearing on profit objective. See Dodge v. Commissioner, T.C. Memo. 1998-89. Petitioners offered into evidence only two "stock summaries", one of which was obviously prepared in 2004.[18] Missing are any records from earlier or later periods that would indicate petitioners were effectively tracking their animals' performance.[19] Petitioners' failure to maintain more comprehensive breeding records suggests the absence of a profit motive.

---

[18]The entries regarding certain horses' ages as compared to their birth dates makes this conclusion possible.

[19]Petitioners' failure to introduce any such records gives rise to the inference that no records were maintained or if maintained were inadequate as breeding records. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

For the reasons detailed above, we conclude that petitioners did not operate the horse activity in a businesslike manner. This factor favors respondent.

Expertise of Petitioners and Their Advisers

Preparation for an activity by extensive study or consultation with experts may indicate a profit motive when the taxpayer carries on the activity as advised. Sec. 1.183-2(b)(2), Income Tax Regs. When analyzing profit motive, expertise with respect to the breeding of horses should be distinguished from expertise in the economics of the business. Golanty v. Commissioner, supra at 432; Sullivan v. Commissioner, supra.

Petitioners had no prior experience in breeding, training, boarding, or selling horses when they first contemplated starting the horse activity. However, Dr. Bronson consulted a number of breeders regarding their operations and also had spent some time in managing a large cooperative horse barn before 2001. She became active in breeders' organizations and became knowledgeable about Welsh ponies and cobs.

Nonetheless, to the extent Dr. Bronson acquired expertise, it was consistent with either a for-profit activity or a hobby. We consequently conclude that this factor is insignificant in determining whether petitioners had a profit motive.

Time and Effort Expended by Petitioners

The fact that taxpayers devote much of their personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate a profit motive. Sec. 1.183-2(b)(3), Income Tax Regs.

Dr. Bronson was not employed during the years at issue and devoted a significant amount of time to the horse activity. However, as discussed infra, much of her time was spent on activities that involved substantial personal and recreational aspects. Accordingly, we find this factor to be neutral.

Expectation That Assets May Appreciate

An expectation that assets used in the activity will appreciate may indicate a profit motive even if the taxpayers derive no profit from current operations. Sec. 1.183-2(b)(4), Income Tax Regs. The appreciation of the activity's assets must exceed operating expenses and be sufficient to recoup the accumulated losses of prior years. See Hillman v. Commissioner, T.C. Memo. 1999-255.

At the time of trial, the assets of the horse activity consisted of 13 horses and land in northern California with an incomplete equine facility. Petitioners offered no evidence regarding the value of their land or its potential for appreciation. Petitioners sold two horses in 2007 for $6,500 and

$10,000. Insofar as the record discloses, the top price petitioners can hope to obtain for a Welsh pony is between $10,000 and $15,000. However, even if one were to assume that each of petitioners' horses was worth $15,000 (a proposition not supported by the record), the appreciation in the horses would recoup no more than a fraction of the $837,752 in cumulative losses petitioners reported through 2008. This factor favors respondent.

Success in Similar or Dissimilar Activities

A taxpayer's past success in similar or dissimilar activities is relevant in determining profit motive. Hillman v. Commissioner, supra; sec. 1.183-2(b)(5), Income Tax Regs. As noted, petitioners had no previous experience with horses. While Dr. Bronson did some work in real estate, there is no evidence concerning the extent of her success in that endeavor. Mr. Bronson had a successful law practice, but his involvement in the horse activity was minimal as compared to Dr. Bronson's. Accordingly, this factor is neutral.

The Activity's History of Income and Losses

While a series of losses during the initial or startup stage of an activity may not necessarily indicate a lack of profit objective, a record of large losses over many years and the unlikelihood of achieving profitability are persuasive evidence that a taxpayer did not have such an objective. See Golanty v.

Commissioner, 72 T.C. at 426; Bessenyey v. Commissioner, 45 T.C. at 274; sec. 1.183-2(b)(6), Income Tax Regs.  However, losses sustained because of unforeseen or fortuitous circumstances beyond the taxpayer's control do not indicate a lack of profit motive.  Sec. 1.183-2(b)(6), Income Tax Regs.

In addition, substantial receipts and significant reduction of losses can be indicative of profit motive even if profitability is not ultimately achieved.  See Blackwell v. Commissioner, T.C. Memo. 2011-188; Rinehart v. Commissioner, T.C. Memo. 2002-9.

Petitioners argue their history of losses occurred during the startup stage of the activity and were caused by unforeseen difficulty they had acquiring property and constructing a facility.  We disagree.  The regulations list drought, disease, fire, theft, weather damage, and depressed market conditions as examples of fortuitous loss-causing circumstances that do not indicate a lack of profit motive.  Sec. 1.183-2(b)(6), Income Tax Regs.  We have also recognized that the death or sickness of horses in connection with a breeding operation constitutes the kind of fortuitous circumstance contemplated in the regulations. See Engdahl v. Commissioner, 72 T.C. at 669.

Petitioners' failure to locate and acquire property for a horse facility for 6 years was not attributable to fortuitous circumstances beyond their control.  Petitioners did not start

the search for a facility until more than a year after the time they claim they realized a facility was essential. They then searched only narrowly in Ventura County. They made offers on only two properties in the first 4 years of their search. Once petitioners expanded their search to northern California, they found and purchased property in a matter of months.

On the basis of the entirety of the evidence, including the size of the annual losses, the continued acquisition of horses before acquiring a facility, and the narrowness of the initial search, we conclude that the 6-year delay in acquiring land for a facility does not constitute a startup period that became protracted on account of fortuitous circumstances but instead was attributable to the fact that making a profit was not petitioners' priority. Petitioners' desultory search for an equine facility persuades us that making a profit was not their "primary" objective in conducting the horse activity. See Wolf v. Commissioner, 4 F.3d at 713; Golanty v. Commissioner, supra at 425.

Further, petitioners' losses are not attributable to any difficulty they encountered constructing a facility. When construction began in 2006, petitioners had already reported 8 years of losses totaling $518,528 from the horse activity.

Finally, when one examines the loss history for the 3 years beyond the years at issue (i.e., 2006-2008 or the 9th, 10th, and

11th years of operation), it is apparent that petitioners' losses were not abating but increasing, even after the period generally considered to constitute a startup period for horse breeding activities; namely, 5 to 10 years. See Engdahl v. Commissioner, supra at 669; Miller v. Commissioner, T.C. Memo. 2008-224. Overall, in view of the foregoing factors, we are not persuaded that petitioners' loss history is attributable to their being in a startup phase. Instead, we are persuaded that to the extent they conducted any breeding, it was not for commercial purposes.

Because we find that petitioners' lengthy period of substantial losses is not attributable to fortuitous circumstances or their being in the startup phase of an activity, their loss history tends to indicate a lack of profit motive.

Amount of Occasional Profits

The amount of profits in relation to the amount of losses incurred may provide useful criteria in determining the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioners have never earned a profit from their horse activity and the evidence suggests future profits are unlikely. This factor favors respondent.

Petitioners' Financial Status

Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity was not

engaged in for profit, especially if there are personal or recreational elements involved.  Sec. 1.183-2(b)(8), Income Tax Regs.  During the years at issue, Mr. Bronson's average annual income from his law practice was $269,200.  Deducting the losses generated by the horse activity from Mr. Bronson's income greatly reduced the after-tax cost of the activity to petitioners.  This factor favors respondent.

Personal Pleasure or Recreation

The existence of recreational elements or personal motives with respect to an activity may indicate a lack of profit motive. Sec. 1.183-2(b)(9), Income Tax Regs.  Conversely, profit motive may be indicated where an activity lacks any appeal other than profit.  Id.

Dr. Bronson was obviously a Welsh pony and cob enthusiast, given her extensive involvement in breeders' organizations, the showing of horses, and column writing.  While, as petitioners urge, such endeavors could be construed as promotional for the Coldstream Farm "brand", we find that they are equally consistent with an avid hobby.  Moreover, because petitioners' horses were all boarded during the years at issue, they essentially avoided the unpleasant tasks associated with caring for horses, such as cleaning stalls, regular exercising, and the like.  Cf. Sullivan v. Commissioner, T.C. Memo. 1998-367 (no profit motive in horse breeding activity even where taxpayers personally cared for most

of their horses).  In addition, petitioners' daughters rode some of the horses recreationally.  See Keating v. Commissioner, T.C. Memo. 2007-309.  On balance, this factor is neutral.

Conclusion

Taking into account all the objective facts and circumstances and the regulatory factors most relevant, we conclude that petitioners lacked the requisite "actual and honest objective of making a profit" with respect to their horse activity.  They took inordinate time to acquire an equine facility even though they concluded in the second year of the activity that such a facility was indispensable to profitability. Their complacency in this regard given the size of their annual losses strongly suggests a lack of profit motive.  They also continued to acquire horses without having made any progress toward acquiring a facility, when an honest profit objective would have dictated curtailment or cessation of the activity until the means for conducting it profitably had been acquired. Their continued acquisitions after 1999 suggest that the horses were acquired in pursuit of a hobby interest.  Moreover, almost half of petitioners' horses were kept on the east coast.  Those horses had not been moved to petitioners' equine facility at the time of trial, even though their California horses were kept there.

There is scant evidence that petitioners conducted a breeding operation in a businesslike manner; they did not keep records of individual horses' performance or breeding history. Even allowing for the most optimistic assumptions about their horses' value, petitioners could not have gotten anywhere near recouping their losses after 11 years of operation and yet were persisting in their pursuit at the time of trial.[20]  See Bessenyey v. Commissioner, 45 T.C. at 274.

Dr. Bronson's extensive involvement in various Welsh horse organizations indicates that the motivation behind the horse activity may have been personal rather than business.  Given Mr. Bronson's law practice income, claiming the horse activity as a business substantially reduced the after-tax cost of what would otherwise be a very expensive hobby.

On brief, petitioners contend that they would not have uprooted their family and Mr. Bronson's law practice and moved 450 miles to Nevada County, California, for a mere hobby, arguing instead that these very significant changes demonstrate that they were in bona fide pursuit of an equine business.  We are not persuaded.  In her testimony, Dr. Bronson recounted how she had become aware of Nevada County through the experience of friends who had moved there "because of their horses, their interest,

---

[20]By contrast, the taxpayers in Engdahl v. Commissioner, 72 T.C. 659 (1979), had decided at the time of trial to abandon their horse activity.

that they were really enthusiasts, not bona fide breeders."
Consequently, a move to Nevada County could have been motivated
by the fact that it was a more hospitable place for a horse
enthusiast to live.  Moreover, although he experienced some
disruption, Mr. Bronson's law practice proved essentially
portable,[21] making the move to Nevada County much less draconian
than petitioners urge.

Given the objective factors summarized above suggesting a
lack of profit motive, petitioners' move to Nevada County
appears, like their friends' move, to have been motived by their
interest in horses rather than an actual and honest intent to
make a profit.  The preponderance of the evidence points to that
conclusion, and we draw it.  Consequently, we conclude and hold
that the horse activity was "not engaged in for profit" within
the meaning of section 183 during the years at issue.

## II.  Accuracy-Related Penalties

Section 6662(a) and (b)(2) imposes a penalty of 20 percent
of the underpayment attributable to a substantial understatement
of income tax.  An "understatement" is the excess of the amount
of tax required to be shown on the return over the amount of tax
shown on the return.  Sec. 6662(d)(2)(A).  An understatement is

---

[21]The relocation of Mr. Bronson's practice to the Sacramento area produced 2 meager years in 2006 and 2007, but his net income in 2008 ($327,567) exceeded that of most of the years he was practicing in the Los Angeles area.

substantial when it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to a taxpayer's liability for penalties. Sec. 7491(c). To satisfy that burden, the Commissioner must offer sufficient evidence to indicate that it is appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). If the Commissioner satisfies his burden of production, the taxpayer bears the burden of proving it is inappropriate to impose the penalty because of reasonable cause, substantial authority, or a similar provision. Id.

Respondent determined that petitioners substantially understated their income tax for 2004 and 2005 and are liable for accuracy-related penalties for these years.[22] Petitioners' disallowed deductions for expenses related to the horse activity, coupled with other adjustments not at issue, resulted in income tax understatements of $32,664 for 2004 and $34,033 for 2005. These amounts exceed both 10 percent of the tax required to be shown on petitioners' returns for those years and $5,000. Thus, respondent has met his burden of production.

---

[22]In his answering brief respondent also asserts negligence as a basis for the penalties. We need not address negligence because we sustain the penalties on the basis of substantial understatement of income tax.

The section 6662(a) penalty is not imposed on any portion of an underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the taxpayer's effort to assess the proper tax liability is the most important factor. Id. The taxpayer's experience, knowledge, and education are also important factors. Id.

Petitioners argue they are not liable for section 6662(a) penalties because they relied on the advice of their accountant, to whom they supplied complete and accurate records. Reasonable reliance upon the advice of a tax professional may establish reasonable cause and good faith for the purpose of avoiding section 6662(a) penalties. Sec. 1.6664-4(c), Income Tax Regs.; see also Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002). The professional advice "must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances." Sec. 1.6664-4(c)(1)(i), Income Tax Regs.

The problem with petitioners' argument is that there is no evidence that they ever sought or received advice from their accountant concerning the appropriateness of deducting the

expenses of their horse activity. Petitioners' accountant testified only that he found their records complete and adequate for purposes of preparing their returns. There is no evidence that he provided an opinion regarding the applicability of section 183 or that petitioners disclosed to him all the pertinent facts and circumstances concerning the horse activity including, for example, their conclusion in 1999 that the activity could not be profitable without an equine facility.

By their own admission, petitioners were on notice no later than 2001 that their tax reporting of the horse activity had attracted the scrutiny of the Internal Revenue Service, which concluded an examination of their 1999 return in that year albeit without making adjustments.[23] In these circumstances, including

---

[23]In their pretrial memorandum petitioners contend that the "no change" audit of their 1999 return "indicated that Petitioners were conducting Coldstream's start-up business operations in compliance with applicable legal requirements". However, they made no reference to the 1999 audit at trial or in their opening or reply brief. Thus, to the extent petitioners may have argued in their pretrial memorandum that the 1999 audit gave them reasonable cause with respect to the 2004 and 2005 underpayments attributable to the disallowed losses from the horse activity, they have abandoned that argument. See Rule 151(e)(4) and (5); Cluck v. Commissioner, 105 T.C. 324, 325 n.1 (1995); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

Even if petitioners were treated as having preserved the argument that the "no change" audit of their 1999 return constituted reasonable cause with respect to the underpayments at issue, see, e.g., Bangs v. Commissioner, T.C. Memo. 2006-83, we are not persuaded. We conclude that the examining agent's decision to make no adjustments regarding petitioners' horse activity for 1999 does not give rise to a reasonable belief that
(continued...)

Mr. Bronson's education and knowledge as an attorney, we conclude that petitioners failed to show that they reasonably relied on professional advice or that they otherwise made a reasonable effort to assess their proper tax liabilities.  Given the absence of reasonable cause, we sustain respondent's determination of accuracy-related penalties for 2004 and 2005.

To reflect the foregoing,

Decisions will be entered

under Rule 155.

---

[23](...continued) the activity was not limited by sec. 183 5 or 6 years later. When petitioners took their return position for 2004, they had experienced 5 additional years of losses from the activity that rose from $33,152 for 2000 to $90,290 for 2004.  Moreover, they had conducted the activity for 5 years without having acquired an equine facility, which by their own admission they had concluded in 1999 was essential to profitability.  In short, what may have easily passed muster as the startup phase of a horse breeding operation for 1999 ceased to do so after 5 additional years of substantial losses during which petitioners failed to take the steps they realized were necessary to make the operation profitable.  See Burrus v. Commissioner, T.C. Memo. 2003-285 (6 years of initial losses treated as startup phase of cattle breeding operation but Court expressed no opinion regarding whether sec. 183 would limit losses claimed for next 4 years after the years in issue).  The foregoing applies with greater force to 2005, although petitioners had by then acquired land on which to construct an equine facility.