T.C. Summary Opinion 2012-24

UNITED STATES TAX COURT

MARK A. RYBERG AND MARTHA M. RYBERG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12120-10S.                    Filed March 12, 2012.

<u>Claudia M. Revermann</u>, for petitioners.

<u>Christina L. Cook</u>, for respondent.

SUMMARY OPINION

ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the

provisions of section 7463 of the Internal Revenue Code in effect when the petition

was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a deficiency in petitioners' joint Federal income tax for 2006 of $4,562 and an accuracy-related penalty of $912.[2]  The issues for decision are:  (1) Whether petitioners engaged in their drag racing and horse breeding activities with the profit objective contemplated by section 183; (2) whether petitioners substantiated their expenses claimed with regard to those activities; and (3) whether petitioners are liable for the accuracy-related penalty under section 6662(a).

## Background

Some of the facts have been stipulated, and they are so found.  We incorporate by reference the parties' stipulation of facts and accompanying exhibits.  Petitioners, Mark and Martha Ryberg, resided in the State of Minnesota when the petition was filed.  In 2006 petitioners operated a joint horse breeding activity, and Mr. Ryberg engaged in a drag racing activity.

---

[1]  Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  All numbers are rounded to the nearest dollar.

## I. Horse Activity

Petitioners' horse activity generally involved breeding and selling horses on a 40-acre farm they owned that primarily consisted of open pasture, private turnouts for horses, a large barn with horse stalls, and petitioners' residence. Petitioners have claimed losses in their horse breeding activity from 1998 to 2006. At all relevant times, Mrs. Ryberg worked 40 hours per week as a buyer and manager at Mimbach Fleet Supply, a supply store that sells products such as horse and livestock equipment. She also has 10 years of experience as a certified horse judge. Mrs. Ryberg stepped down as a horse judge when petitioners began their horse breeding activity so that she could devote her weekends to horse breeding.

Sometime before the start of operations in the horse breeding activity, Mrs. Ryberg conducted extensive research with respect to horse bloodlines and color genetics, paying particular attention to a dilution gene associated with a "champagne" horse color. Petitioners learned that the horse market exhibited greater demand for certain horse colors, such as the champagne color, and they planned to isolate the champagne dilution gene in their breeds to capitalize on that demand. In addition, petitioners believed that their stallions had very high stud prospects. Petitioners' Tennessee Walker stallion in particular exhibited a high stud

prospect as there were no other stallion breeds of that kind within a 100-mile radius of petitioners' ranch.

During the initial planning phase, petitioners visited other breeding operations to determine what would differentiate their services from the services offered by their competitors. In addition, petitioners attended horse sales and auctions to analyze the horse market and to determine which horses were in high demand. Moreover, petitioners researched different avenues of marketing the services they planned to provide.

In 1999 Mrs. Ryberg began taking classes offered by the University of Minnesota, completing courses in pasture renovation, feedlot permits, and manure management. In addition, she completed a law school course on horse breeding contracts. Mrs. Ryberg later applied what she had learned, drafting custom breeding contracts to use in petitioners' horse breeding activity. Furthermore, she studied the pricing system used by other stallion owners and received training regarding how to determine and track feeding costs associated with different stages of horse breeding (gestation, lactation, etc.).

After their initial planning phase, petitioners began their joint horse breeding activity in earnest, operating under the name "Rybergs Roadside Ranch". Petitioners' business plan was to (1) breed horses to create marketable offspring,

concentrating on a gene that produced a particular high-valued horse color, and (2) provide stud services using their stallions. Petitioners individually owned horses before beginning their horse breeding activity but sold those horses that did not fit within their business plan. In terms of infrastructure, petitioners constructed a large amount of fencing, numerous private turnouts, and an extensive network of electrical and water utilities on their ranch.

Petitioners' chores consisted of feeding, watering, and grooming the horses, cleaning stalls, hauling hay, and purchasing feed. On some occasions, Mr. Ryberg would spend the entire weekend spreading manure for compost. Petitioners also trained, cared for, and guided their horses through the breeding process. They spent their mornings and evenings during the week tending to the horse breeding activity, and Mrs. Ryberg worked on the farm every weekend accompanied by Mr. Ryberg when he was not engaged in his drag racing activity. Petitioners used a 1993 Chevrolet truck to haul supplies, transport horses, and perform other work associated with their horse breeding activity.

Every year, petitioners maintained a business ledger with a monthly account of their revenue and expenses. Petitioners used a separate charge account at Mimbach Fleet Supply solely for their horse breeding activity and analyzed their account statements every month. Petitioners also maintained books to track each

horse's performance, including registration certificates, dental records, gestation tables, offspring records, show records, and breeding contracts. Using a spreadsheet, petitioners also tracked the breeding status of their clients' mares and the fees paid for each breeding. Petitioners' formal breeding contracts, printed with the "Rybergs Roadside Ranch" logo, outlined the breeding process, petitioners' live foal guarantee, and what was expected from petitioners and the client. Petitioners advertised their services in local stores, on the Internet, at saddle clubs, and at breed shows. They also publicized their breeds in horse registries where prospective clients could view information on each of petitioners' horses. Furthermore, petitioners entered into breeding consignments and broadened the marketability of their breeds by training select horses in cattle roping.

Unfortunately for petitioners, their horse breeding activity experienced a series of setbacks shortly after its inception. Sometime after petitioners began operations, many of their horses were infected with the West Nile virus. The illness increased veterinarian's fees and required petitioners to allocate additional time and physical labor to care for the sick horses.

In October 2001 Mr. Ryberg injured his back in an automobile accident on a public highway (2001 injury). Consequently, petitioners were forced to hire

workers to assist them on the ranch as Mr. Ryberg had trouble performing some of his normal tasks, such as throwing hay bales and tending to the foals.

In 2002 the horse breeding industry began to experience a significant downturn because of low demand for horses. Aggravating already depressed industry conditions, Federal regulations were promulgated that increased the cost of sending horses to slaughter. This increased the supply of unwanted horses that resulted in a reduced base price for all horses.

In response to these setbacks and depressed market conditions, petitioners attempted to cut costs and explored new methods of operation. Using the feed cost management training she received, Mrs. Ryberg reduced feed costs incurred by the horse breeding activity. To lower veterinarian's costs, petitioners began vaccinating the horses themselves. In addition, petitioners stopped showing their horses in expensive local saddle clubs, opting instead to focus on larger breed shows that provided better marketing exposure. They also switched to a more cost-effective method of controlling flies by using fly parasites rather than expensive sprays and chemicals. Furthermore, petitioners began buying their horse bedding supplies from bulk distributors. Moreover, petitioners consulted with other owners of breeding and boarding operations regarding the potential profitability of adding boarding

services to their business plan. Petitioners learned, however, that focusing on boarding would greatly increase their already substantial expenses while adding little to their revenue, and therefore they continued to concentrate on horse breeding and stud services. In that regard, petitioners began working with a veterinarian to explore a method of equine artificial insemination. Petitioners ultimately abandoned this technique, however, when Mrs. Ryberg became ill.

In 2005 Mrs. Ryberg was diagnosed with cancer. Despite her diagnosis, petitioners remained hopeful that, after weathering the initial difficult years of losses, their investment and cost-cutting measures would enable them to experience a profitable year in 2006. Unfortunately for petitioners, they incurred substantial losses in 2006 totaling $22,270.

Petitioners attached a Schedule F, Profit or Loss From Farming, to their 2006 joint Federal income tax return (2006 tax return) for their horse breeding activity and reported gross farm income of $4,850 and farm expenses as follows:

Schedule F

| Expenses | Amount | Expenses | Amount |
|---|---|---|---|
| Car and truck | $1,985 | Taxes | 1,040 |
| Depreciation | 7,917 | Veterinary, etc. | 875 |
| Feed | 4,390 | Bedding | 500 |
| Freight and trucking | 206 | Farm tax prep | 100 |
| Mortgage interest | 9,220 | Farrier | 572 |
| Repairs and maintenance | 90 | Professional dues | 158 |
| | | Truck trailer license | 67 |
| Total | | | 27,120 |

In light of their 2006 losses, petitioners determined that the horse breeding activity would not become profitable and terminated operations in 2007. Petitioners experienced several years of uninterrupted losses, never earning a profit in their horse breeding activity.

## II. Racing Activity

Mr. Ryberg began drag racing in 1990 and has engaged in his drag racing activity for over 20 years. His race car, a 1968 Chevrolet Rally Sport Camaro, was purchased for $6,500 and is highly modified for racing. Mr. Ryberg saved his receipts in envelopes and tracked his drag racing expenses using a spreadsheet. Over the years, he sought advice from other drivers, racing mechanics, and technicians to improve his drag racing performance. He also subscribed to National Dragster magazine and is a member of the National Hot Rod Association. He reviewed trade magazines for information such as deals on car parts, track altitudes, and the standings of his competitors but did not consult with advisers regarding the business aspects of drag racing.

The drag racing season runs from April to late October. Mr. Ryberg works 40 hours per week as a spray painter for Hoffman Engineering Corp. He engages in drag racing on select weekends and spends some of his spare time during the week searching for sponsors. Mr. Ryberg provides his sponsors with a document of

accomplishments from the prior year and a description of his goals for the coming year. He also drafts a rudimentary contract for his sponsors when a sponsorship agreement is reached. He uses a 1999 Chevrolet truck and a trailer to haul his race car to drag racing events. Mr. Ryberg places sponsorship stickers on his car and trailer as advertising.

Because of the lingering effects from his 2001 injury, Mr. Ryberg took time off from drag racing beginning in October 2001 and did not return until May 2002. Despite his 2001 injury, Mr. Ryberg experienced his best racing year in 2004 when he won the championship in his division. Even in his best racing year, however, Mr. Ryberg was still unable to earn a profit.

In 2006 Mr. Ryberg attempted to minimize costs by only entering races that had larger car counts and thus paid out larger purses for winning. Unfortunately for Mr. Ryberg, racing less also decreased his driving performance. Consequently, although Mr. Ryberg reported gross racing income of $3,125 in 2006, only $750 of that amount was attributable to race winnings (the remaining amount was attributable to sponsorships, etc). Petitioners attached a Schedule C, Profit or Loss From Business, to their 2006 tax return reporting a net loss of $6,076 and claiming the following expense deductions:

### Schedule C

| Expense | Amount | Expense | Amount |
|---|---|---|---|
| Car and truck | $2,488 | Memberships | 110 |
| Depreciation | 3,433 | Racing fuel | 519 |
| Repairs and maintenance | 1,329 | Safety attire | 229 |
| Entry fees | 1,017 | Truck trailer license | 76 |
| Total | | | 9,201 |

In 2007 Mr. Ryberg ceased reporting his drag racing activity as a business, but continued to engage in the activity as a hobby thereafter.  In 20 years of drag racing, Mr. Ryberg has never earned a profit, instead reporting a long history of uninterrupted losses.

### Discussion

In general, the determinations of the Commissioner in a notice of deficiency are presumed correct, and the burden is on the taxpayer to show that the determinations are erroneous.  See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving that the taxpayer is entitled to any deduction claimed.  Deputy v. du Pont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).[3]

---

[3] Sec. 7491 does not apply in this case to shift the burden of proof to respondent because petitioners neither alleged that sec. 7491 was applicable nor established that they fully complied with the requirements of sec. 7491(a)(2) with

(continued...)

I. Profit Objective

Section 183 precludes deductions for activities not engaged in for profit except to the extent of the gross income derived from such activities. Sec. 183(a) and (b)(2). For a taxpayer's expenses to be deductible under section 162, Trade or Business Expenses, or section 212, Expenses for Production of Income, and not subject to the limitations of section 183, a taxpayer must show that he or she engaged in the activity with the objective of making a profit. Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without opinion, 702 F.2d 1205 (D.C. Cir. 1983); Hastings v. Commissioner, T.C. Memo. 2002-310. Although a reasonable expectation of a profit is not required, the taxpayer's profit objective must be actual and honest. Dreicer v. Commissioner, 78 T.C. at 645; sec. 1.183-2(a), Income Tax Regs.

The existence of an actual and honest profit objective is a question of fact that must be decided on the basis of the entire record. See Benz v. Commissioner, 63 T.C. 375, 382 (1974). In resolving this factual question, greater weight is accorded objective facts than a taxpayer's statement of intent. See Westbrook v.

---

[3](...continued)
respect to any of the issues before the Court.

Commissioner, 68 F.3d 868, 875-876 (5th Cir. 1995), aff'g T.C. Memo. 1993-634; sec. 1.183-2(a), Income Tax Regs.

The regulations under section 183 provide a nonexhaustive list of nine factors that may be considered in deciding whether a profit objective exists. Sec. 1.183-2(b), Income Tax Regs. No single factor, nor even the existence of a majority of factors favoring or disfavoring an actual and honest profit objective, is controlling. See id. Rather, the relevant facts and circumstances of each case are determinative. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981).

On the basis of all the facts and circumstances in the present case, we hold that petitioners have met their burden of proof as to their horse breeding activity but have failed to prove that Mr. Ryberg engaged in his racing activity for profit within the meaning of section 183. We do not analyze in depth all nine of the factors enumerated in the regulations but rather focus on some of the more important ones that inform our decision.

A. Horse Activity

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective.

Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners generally carried on their horse breeding activity in a businesslike manner, conducting market research before startup, educating themselves on the business and economic aspects of the activity, drafting formal breeding contracts, and extensively advertising and publicizing their services. Furthermore, petitioners kept accurate books and records on a monthly basis and maintained a separate charge account for their horse breeding activity. Petitioners' books and records enabled them to make informed business decisions such as successfully cutting overall feed costs. See Burger v. Commissioner, 809 F.2d 355 (7th Cir. 1987) (holding that a taxpayer need not maintain a sophisticated cost accounting system but should keep records that enable the taxpayer to make informed business decisions), aff'g T.C. Memo. 1985-523. Petitioners' business plan, although not written, was concretely established by the evidence. See Phillips v. Commissioner, T.C. Memo. 1997-128 (holding that a business plan need not be written but may be established by evidence of a taxpayer's actions). Moreover, petitioners sold the horses they already owned that did not fit with their business plan, an indication that they viewed their horses as business assets rather than domestic pets kept for recreational purposes.

A change of operating methods, adoption of new techniques, or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. To control expenses petitioners successfully cut feed costs, began vaccinating their horses themselves, and switched to a more cost-effective method of controlling flies. Petitioners also started entering into breeding consignments and broadening the marketability of select horses by adapting and training them in cattle roping. In addition, petitioners shifted their advertising focus from expensive local saddle clubs to larger breed shows to provide broader and more cost-effective market exposure. Furthermore, petitioners shifted to buying from bulk distributors to cut costs associated with bedding supplies. Although their plan was not fully implemented because of Mrs. Ryberg's illness, petitioners worked with one of their veterinarians to explore equine artificial insemination as an alternative horse breeding technique. Moreover, petitioners consulted with other business owners regarding the profitability of adding horse boarding to the services petitioners offered. Finally, petitioners abandoned horse breeding operations in 2007 when they determined that they could not turn a profit.

A taxpayer's expertise, research, and study of an activity, as well as his or her consultation with experts may be indicative of a profit objective. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioners individually owned horses before starting their horse breeding activity and went to great lengths to refine their expertise in horse breeding. Mrs. Ryberg, in particular, developed extensive expertise in many areas, including horse bloodlines, horse genetics, pasture renovation, feedlot permits, manure management, and all aspects of the horse breeding process. Petitioners regularly consulted with an expert farrier and at least two veterinarians throughout the course of their horse breeding activity.

More importantly, however, petitioners researched and studied the business and economic aspects of horse breeding. Petitioners researched various methods of marketing the services they planned to provide. They also visited other stallion farms to determine what would differentiate their stud services from the stud services offered by their competitors. In addition, petitioners attended horse sales and auctions to determine what specific types of horses were in high demand. Furthermore, Mrs. Ryberg completed a law school course on breeding contracts and subsequently began drafting custom breeding contracts for horse breeding clients. She also learned the pricing system for stud services used by other stallion owners

and received training regarding how to accurately determine and track feeding costs at different stages of the breeding process. Mrs. Ryberg later applied the knowledge and training she obtained to successfully reduce feed costs associated with petitioners' horse breeding activity. Finally, petitioners consulted with other owners of breeding and boarding operations regarding the potential profitability of adding boarding services to their business plan.

A taxpayer's devotion of a great deal of personal time and effort to carrying on an activity may indicate a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs. Petitioners were not casual horse owners. They did not ride their horses for pleasure. Instead, petitioners performed all the daily physical labor associated with caring for, training, and guiding the horses through the breeding process. They invested much time and effort in refining their expertise with respect to horse breeding, and they completed all of the exhausting work of delivering foals, cleaning horse stalls, spreading manure for compost, and transporting feed. Mrs. Ryberg even resigned from being a horse judge so that she could devote more time to performing these labor-intensive tasks. Petitioners worked with the horses morning and night during the work week. Mrs. Ryberg also devoted every weekend to the horse breeding activity, accompanied by Mr. Ryberg whenever he was not engaged

in his drag racing activity. Finally, respondent conceded at trial that petitioners spent substantial time engaging in their horse breeding activity.

A taxpayer's history of income or losses with respect to the activity can indicate whether a profit objective was present. Sec. 1.183-2(b)(6), Income Tax Regs. A series of losses during the initial or startup phase of an activity, however, does not necessarily indicate the absence of an actual and honest profit objective. Id. On the basis of the record, we find that petitioners' losses were incurred in what we conclude to be the startup phase of their horse breeding activity. See Engdahl v. Commissioner, 72 T.C. 659, 669 (1979) (recognizing that the startup phase of a horse breeding activity could last as long as ten years); see also Blackwell v. Commissioner, T.C. Memo. 2011-188.

In addition, losses sustained because of unforeseen circumstances beyond the taxpayer's control do not indicate that the taxpayer lacked a bona fide profit objective. Sec. 1.183-2(b)(6), Income Tax Regs. Petitioners' losses can also be explained by numerous events that occurred outside their control, including Mr. Ryberg's back injury, an onset of the West Nile virus that infected petitioners' horses, a downturn in the horse breeding industry, and Mrs. Ryberg's illness. Thus, on the record before us, we do not view petitioners' history of losses as an

indication that they lacked an actual and honest profit objective. In contrast, the fact that petitioners shut down their horse breeding activity once they determined that it would not be profitable strongly indicates that they had an actual and honest profit objective. See Dwyer v. Commissioner, T.C. Memo. 1991-123.

Considering all the facts and circumstances, we find that petitioners' horse breeding activity was engaged in for profit within the meaning of section 183.

B. Racing Activity

Although some factors may suggest that Mr. Ryberg carried on his racing activity in a businesslike manner, we are unable to conclude, on the basis of the record before us, that he engaged in the drag racing activity with the profit objective contemplated by section 183. Admittedly, Mr. Ryberg obtained a few sponsors to help defray costs, saved receipts related to the drag racing activity in envelopes, and allegedly tracked his expenses using a spreadsheet. He also attempted to minimize losses in 2006 by entering fewer races. However, the sparse documentary evidence Mr. Ryberg was able to provide with regard to the drag racing activity tends to belie his contention that he maintained complete business records and operated his drag racing activity in a businesslike manner. Mr. Ryberg did not provide a copy of the spreadsheet or any other document he allegedly used to track his 2006 expenses.

He also did not provide any books or records to document his 2006 race winnings or sponsorship money. Mr. Ryberg's inability to provide these documents at trial weighs heavily against a finding that he operated his drag racing activity in a businesslike manner.

Moreover, much of the evidence suggests that Mr. Ryberg did not engage in drag racing with a profit objective. Over the years Mr. Ryberg sought the advice of other drivers and racing mechanics to improve his drag racing performance. A desire to improve racing performance does not necessarily indicate, however, that he ever engaged in drag racing with a profit objective. Instead, we focus our attention on Mr. Ryberg's expertise, and that of his advisers, as it relates to the business aspects of the activity in question. See Wesinger v. Commissioner, T.C. Memo. 1999-372 (citing Golanty v. Commissioner, 72 T.C. at 432). Mr. Ryberg is employed full time as a spray painter. No evidence suggests that he studied or has particular expertise in the business, financial, or economic aspects of drag racing. Furthermore, no evidence indicates that he sought advice regarding how to make his activity a profitable business.

Despite 20 years of drag racing, Mr. Ryberg has never earned a profit. Instead he has incurred uninterrupted losses over a very extended period of time.

No evidence suggests that 20 years constituted the startup phase for Mr. Ryberg's drag racing activity. His 2001 injury does not explain the losses Mr. Ryberg has incurred since 1990. Moreover, despite his 2001 injury, Mr. Ryberg experienced his best racing season in 2004 yet still failed to earn a profit. In Mr. Ryberg's case, the potential to become profitable through winning races alone seems implausible given the substantial amount of expenses he incurred each year and the relatively small purses paid out by the races in which he participated.

Finally, it is clear that Mr. Ryberg derives personal pleasure from drag racing and participates in races as a form of recreation. Indeed, even after petitioners ceased reporting the racing activity as a for-profit business in 2007, Mr. Ryberg continued to engage in the drag racing activity as a hobby.

Petitioners have failed to meet their burden of proof with respect to Mr. Ryberg's racing activity and, as a result, we are unable to conclude that Mr. Ryberg engaged in drag racing with the profit objective contemplated by section 183. Consequently, petitioners are entitled to deduct expenses associated with such activity only to the extent of Mr. Ryberg's gross receipts from the activity and in accordance with the remainder of this opinion.

## II.  Substantiation

A taxpayer is required to maintain records sufficient to substantiate deductions claimed by the taxpayer on his or her return.  See generally sec. 6001; sec. 1.6001-1(a), (e), Income Tax Regs.[4]  As a general rule, if, in the absence of required records, a taxpayer provides sufficient evidence that the taxpayer has incurred a deductible expense, but the taxpayer is unable to adequately substantiate the amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of such expense and allow the deduction to that extent.  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).  In order for the Court to estimate the amount of an expense, however, we must have some basis upon which an estimate may be made.  Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).

---

[4]  Sec. 6001 provides that "[e]very person liable for any tax imposed by this title, or for the collection thereof, shall keep such records * * * and comply with such rules and regulations as the Secretary may from time to time prescribe."

Sec. 1.6001-1(a), Income Tax Regs., provides that "any person subject to tax * * * shall keep such permanent books of account or records * * * as are sufficient to establish the amount of * * * deductions".

Sec. 1.6001-1(e), Income Tax Regs., provides that "[t]he books or records required by this section shall be kept at all times available for inspection by authorized internal revenue officers or employees, and shall be retained so long as the contents thereof may become material in the administration of any internal revenue law."

Without such a basis, any allowance would amount to unguided largesse. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957).

Notwithstanding the foregoing, in the case of certain expenses, section 274(d) expressly overrides the Cohan doctrine. Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). Specifically, and as pertinent herein, section 274(d) provides that no deduction is allowable with respect to listed property, such as passenger automobiles, unless the deduction is substantiated in accordance with the strict substantiation requirements of section 274(d) and the regulations promulgated thereunder.[5] Thus, under section 274(d), no automobile-related deduction, including depreciation, is allowable on the basis of any approximation or the unsupported testimony of the taxpayer. Yecheskel v. Commissioner, T.C. Memo. 1997-89, aff'd without published opinion, 173 F.3d 427 (4th Cir. 1999); see, e.g., Murata v. Commissioner, T.C. Memo. 1996-321; Golden v. Commissioner, T.C. Memo. 1993-602.

---

[5] Included in the definition of listed property in sec. 280F(d)(4) is any passenger automobile or other property used as a means of transportation.

In the instant case, the documentary evidence regarding petitioners' deductions is limited. On the basis of the record, however, we are convinced that petitioners are entitled to some deductions.

A. Horse Activity

Insofar as petitioners' horse breeding activity is concerned, they have provided sufficient evidence to substantiate, and are therefore entitled to deduct, the following amounts of expenses: $4,390 for feed, $90 for repairs and maintenance, $875 for veterinarian's fees and breeding expenses, $500 for bedding, $572 for farrier expenses, and $158 for professional dues.

Although petitioners may have incurred and paid additional expenses beyond those just enumerated, they have provided us with no basis upon which an estimate may be made.[6] Therefore, we must deny the remainder of petitioners' claimed deductions. See Vanicek v. Commissioner, 85 T.C. at 743.

Furthermore, petitioners' 1993 Chevrolet truck used in the horse breeding activity is a passenger automobile that falls within the definition of listed property

---

[6] The record is silent with regard to the following expenses claimed on petitioners' Schedule F: (1) Mortgage interest, (2) taxes, (3) farm tax preparation, and (4) truck trailer license. Although Mrs. Ryberg mentioned expenses possibly related to freight and trucking, petitioners provided us with no basis to estimate an amount they may have paid or incurred in 2006 for these expenses.

under section 280F(d)(4) and (5). Therefore, petitioners' mileage and depreciation deductions for this vehicle are subject to the strict substantiation requirements of section 274(d). Petitioners provided no document that qualifies as an adequate record within the meaning of section 274(d) and no other corroborative evidence sufficient to satisfy the requirements of that section. Although petitioners submitted a handwritten note of a purported odometer reading at the beginning of 2006 and a purported odometer reading at the end of 2006 for the truck, such document alone does not satisfy the strict substantiation requirements of section 274(d). Moreover, petitioners provided no documents sufficient to substantiate the depreciation deduction they claimed for the truck. Consequently, although we may find petitioners' testimony to be credible, we have no choice but to hold that the mileage and depreciation deductions claimed by petitioners for the 1993 Chevrolet truck are denied in full.

B. Racing Activity

Insofar as Mr. Ryberg's racing activity is concerned, petitioners have provided sufficient evidence to substantiate expenses that equal, if not exceed, Mr. Ryberg's gross income from the drag racing activity in 2006. Thus, we conclude

that petitioners are entitled to deduct $3,125 in expenses related to Mr. Ryberg's racing activity. See sec. 183(b).

## III. Penalty

Section 6662(a) and (b)(1) imposes a penalty equal to 20% of the amount of any underpayment attributable to negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with tax laws, and "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c). Negligence also includes any failure to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs.

Section 6664(c)(1) provides an exception to the imposition of the accuracy-related penalty if the taxpayer establishes that there was reasonable cause for, and the taxpayer acted in good faith with respect to, the underpayment. Sec. 1.6664-4(a), Income Tax Regs. The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

With respect to a taxpayer's liability for any penalty, section 7491(c) places on the Commissioner the burden of production, thereby requiring the Commissioner to come forward with sufficient evidence indicating that it is appropriate to impose the penalty. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. See id. at 447; see also Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

Respondent has proven, and has therefore discharged his burden of production under section 7491(c), that petitioners failed to keep adequate records and properly substantiate most of their claimed expenses. See sec. 1.6662-3(b)(1), Income Tax Regs.

Petitioners have not met their burden of persuasion with respect to reasonable cause and good faith. At trial, petitioners had little to say about this issue other than to state that they consulted a tax return preparer. Petitioners did not call their tax return preparer as a witness at trial and did not provide any further evidence to support a finding of reasonable cause. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947). Thus, on the record before us, we are unable to conclude that petitioners acted with

reasonable cause and in good faith within the meaning of section 6664(c)(1).

Accordingly, petitioners are liable for the accuracy-related penalty under section 6662(a).

## Conclusion

We have considered all of the arguments advanced by the parties, and, to the extent not addressed herein, we conclude that they are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.