FINIS R. WELCH AND LINDA J. WAITE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Waite v. Comm'r
Docket No. 20611-12 United States Tax Court
2017 Tax Ct. Memo LEXIS 228; November 20, 2017, Filed
Decision text below is the first available text from the court; it has not been editorially reviewed by LexisNexis. Publisher's editorial review, including Headnotes, Case Summary, Shepard's analysis or any amendments will be added in accordance with LexisNexis editorial guidelines.
*228 Docket No. 20611-12. Filed November 20, 2017.
George W. Connelly, Jr.,and Heather M. Pesikoff, for petitioners.
M. Kathryn Bellis, Courtney M. Hill, and Sharbel Sfeir (student), for
respondent.
MEMORANDUM FINDINGS OF FACT AND OPINION
PARIS, Judge: Respondent determined deficiencies of $869,416,
$1,533,336, and $1,220,441 in Dr. Welch (petitioner) and Dr. Waite's1 Federal
1Both petitioners have earned doctoral degrees, and they will be referred to (continued...)
- 2 -
[*2] income tax for 2007, 2008, and 2009, respectively, and determined a
deficiency of $1,316,520 in petitioner's Federal income tax for 2010. The sole
issue for decision is whether petitioner's ranching activity was engaged in for
profit under section 183 for the years in issue.2
FINDINGS OF FACT
Some of the facts have been stipulated and are so found. The first
stipulation of facts, the first supplemental stipulation of facts, and facts drawn
from the stipulated exhibits are incorporated herein by this reference. Petitioner
resided in Texas and Dr. Waite resided in Illinois when they timely filed their
petition.
I. Petitioners' Backgrounds
A. Petitioner
Since middle school petitioner has been involved in vocational agriculture
activities. He continued *229 those activities through high school. Tragically,
petitioner was in a severe automobile accident during his freshman year of college
1(...continued)
as petitioner and Dr. Waite or petitioners.
2Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) of 1986, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.
- 3 -
[*3] and has been in a wheelchair since. After his recovery he continued his
education and earned a bachelor of science degree in agricultural economics from
the University of Houston in 1961 and earned a Ph.D. in economics from the
University of Chicago in 1966.
Petitioner has had a multifaceted career. He was an economics professor for
40 years and taught at the University of Chicago, Southern Methodist University,
the City University of New York, University of California at Los Angeles, and
Texas A&M University, and he retired from the last in 2003. In the early 1970s he
began testifying as an expert witness in civil litigation cases. In 1976 he founded
Welch Consulting and, as of the time of trial, was its sole owner, president, and
chief executive officer. Welch Consulting *230 is a private consulting firm that
provides economic and statistical consulting for lawsuits involving discrimination
claims. It has offices in Los Angeles, California, Washington, D.C., and Bryan,
Texas.3
In 1979 petitioner incorporated Unicon Research Corp. (Unicon). Through
Unicon petitioner conducted his major research activities, which were funded by
Federal grants and contracts. Because he found the bureaucratic process of
3Bryan, Texas, is a small town near College Station, Texas, the location of TexasA&M University, and is approximately one hour from petitioner's ranch.
- 4 -
[*4] obtaining Federal funding too cumbersome, he began funding his own
research and supporting it with assistance from Unicon and Welch Consulting. As
of the time of trial petitioner still performed managerial activities at Unicon.
In 1982 petitioner formed a partnership, Computing Resource Center
(CRC), of which he was a 50% partner. CRC eventually became StataCorp LP.
StataCorp provides software for the research community. During the years in
issue petitioner was no longer involved in StataCorp's day-to-day operations and
did not receive a salary from it.
In 2007 petitioner formed PayEval to develop a statistical program *231 that
would assist businesses in assessing the equal opportunity outcomes between
demographic groups in pay, promotion, and other areas. After two or three years
he was unable to sell the program and ceased development. Starting in 2009
petitioner considered PayEval part of Welch Consulting.
Meanwhile, back at the ranch in Texas Fridays and Saturdays were work
days, with the ranch being relatively quiet on Sundays. During the years in issue
petitioner spent Thursday nights through Sundays at his ranch.
Petitioner has never had a written business plan for any of his business
ventures.
- 5 -
[*5] B. Dr. Waite
Dr. Waite holds a master's degree and a doctorate in sociology. She has
been a professor at the University of Chicago since 1991. She and petitioner
married in 2007 and divorced in 2010. During the years in issue Dr. Waite split
her time between Chicago, Illinois, and petitioner's ranch in Texas, spending the
weekends at the ranch with petitioner. Although she toured the ranch with
petitioner and occasionally listened to his ideas and plans for it, Dr. Waite was not
involved in any of the ranch operations.
II. Center Ranch A. Land
In 1987 petitioner purchased the first 130 acres of land that would become *232 Center Ranch.4 Center Ranch now comprises nearly 8,700 acres on seven tracts of
land in Leon County, Texas, near Centerville.5 Petitioner purchased thousands of
those acres during the years in issue. Center Ranch is split into the following
divisions:
4Petitioners offered expert reports for Center Ranch's real estate, its cattle, and its horses. Over respondent's objections, all of those reports were entered into evidence. Respondent offered no expert reports.
5Petitioner owns 8,688 acres and leases another 900 acres for various ranch purposes. See infra p. 7. - 6 - [*6] Acquisition Purchase Appraised DivisionAcreage1 datespricevalue2 Headquarters 2,410 1987-2010 $4,493,166 $14,630,000 Buffalo Creek 1,274 1989-1999 861,563 2,720,000 Stanmire/River- bottom 1,172 1990-2008 906,687 2,900,000 Coker Place 320 2006 639,000 1,032,000 Trinity River 2,703 2007, 2010 3,950,535 5,510,000 Keechi Creek 761 1998 477,300 2,970,000 *233 Bull pens/ receiving pens 48 1989 43,500 470,000 Total 8,688 n/a 11,371,751 330,232,000 1All acreage amounts are rounded to the nearest whole number.
2The appraised values are as of Nov. 12, 2013, the inspection date of petitioner's expert witness.
3The appraised value of each division includes the surface and mineral rights petitioner owned. The Keechi Creek Division had six acres fenced off for an oil pad, for which petitioner received rent. In 2010 petitioner earned over $900,000 of oil and gas royalties that he reported on a Schedule E, Supplemental Income and Loss (From rental real estate, royalties, partnerships, S corporations, estates, trusts, REMICs, etc.), attached to his return.
Headquarters includes the veterinary clinic (vet clinic), the horse center, the horse
training facilities, and the Mill Creek Division, which includes more than 45 acres
of lakes.6 The divisions are noncontiguous tracts of land except for Headquarters
6As of 2006 petitioner's personal residence was on 20 acres of Headquarters property and was not considered *234 part of Center Ranch.
- 7 -
[*7] and Mill Creek Division. Petitioner purchased Coker Place as an investment
property. Coker Place is wooded, and the 320 acres are leased for hunting.
During the years in issue petitioner also leased approximately 900 acres known as
Sadler Place Division for ranch purposes.
Additionally, petitioner owned two duplexes on approximately 20 acres of
land in Centerville. Although they were in town, petitioner considered the
duplexes part of Headquarters. They were purchased when Center Ranch needed
housing for ranch hands. If the duplexes were not needed to house ranch hands,
they were leased month to month.
B. Ranch Operations
In 1987 petitioner's original intent was to grow hay as a cash crop and to
raise some cattle on the first 130 acres he had purchased. Center Ranch is now a
multioperational, 8,700-acre ranch with 25 full-time employees who receive
annual salaries ranging from $25,000 to $115,000.7 Petitioner also employs part-
time ranch hands as needed. Over the years petitioner has realigned his workforce
to reflect current needs, and he has fired employees for nonperformance or
7The median household income for Leon County was $40,355 in 2010. U.S. Census Bureau, *235 American FactFinder, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/10_5YR/B19013/0500000U S48289 (last visited August 8, 2017). During the years in issue at least four Center Ranch employees' annual salaries were more than that.
- 8 -
[*8] inappropriate behavior. The three main Center Ranch operations are cattle,
hay, and horses, each of which will be discussed in more detail infra.
Center Ranch also had a vet clinic that provided services for large and small
animals.8 Construction on the vet clinic began in 2003; it was originally built to
support Center Ranch's horse operation. All of the vet clinic's employees--except
the veterinarians--were Center Ranch employees. There was a licensed
veterinarian on site during each of the years in issue. Petitioner rented the vet
clinic facilities to the veterinarians and had management services agreements and
licensing agreements with them. The vet clinic provided services for Center
Ranch animals under the management services agreements. It provided services
for animals owned by the public for a fee. The vet clinic was a separate entity and
filed its own tax returns for the years in issue.
Center Ranch had a trucking operation and owned multiple 18-wheeler *236 trucks that it used to move cattle and hay around the ranch and to transport cattle
when they were purchased or sold. It also leased the trucks to move the cattle and
the hay of others, and it charged the third parties per load hauled. Center Ranch
8The vet clinic did not start providing services for small animals until 2011, one year after the years in issue.
- 9 -
[*9] also performed backhauls--picking up a load on a return trip--to maximize its
trucks' use.
Additionally, there was a timber operation--including a timber manager--
and there were several hundred acres leased for hunting on Center Ranch. In the
late 1980s petitioner did only "a little bit" of hunting on ranch property and has
done none since then. During the years in issue Center Ranch had a website and a
Facebook page, advertised in the Quarter Horse Directory online, and had videos
of its operations and of its horses performing in various competitions posted to
YouTube. As with his other business ventures, petitioner did not have a written
business plan for Center Ranch.
During the years in issue petitioner subscribed to the following professional
publications: Brangus Journal, Angus Journal, Showbox (Texas Junior Livestock
Association *237 publication), American Red Angus Magazine, Gulf Coast Cattleman,
the Cattleman Magazine, the Maine Anjou Voice, Livestock Reporter, Brahman
Journal, Working Ranch Magazine, the Ear (a genetics marketing magazine), the
Progressive Farmer, Rancher's Exchange, Western Horseman, Quarter Horse
News, Quarter Horse Journal, Cutting Horse Chatter, Reined Cow Horse News,
Pacific Coast Journal, America's Horse, and Billings' Livestock Commission
Horse Sale Update.
- 10 -
[*10] 1. Cattle Operation9
Soon after purchasing the initial 130 acres of land, and upon the advice of
his high school vocational agriculture teacher, petitioner purchased 34 bred heifers
at auction with the intent of using their calves to start a club calf operation.10
Initially, petitioner's former teacher was going to manage the club calf operation
for him. Unfortunately, he passed away shortly before petitioner purchased the
cattle. After a short period of managing the club calf operation, petitioner decided
that it would not be profitable because the prices were low, the bred heifers he
purchased were not the preferred club calf breed and did not sell well, and
marketing the operation was too time consuming. In total the club calf operation *238 did not last more than five years.
For business reasons petitioner decided to move to a beef cattle operation
and began breeding purebred Maine Anjou cattle. Unfortunately, because that
breed of cattle proved not well suited for the hot and humid climate of Leon
County and did not do well, he again modified the operation. In 1996, after
9Some common terms in the cattle industry include: (1) "calves", which are young cattle, (2) "heifers", which are young females that have not given birth to a calf, (3) "bred heifers", which are pregnant heifers, (4) "cows", which are mature females, and (5) "bulls", which are mature males.
10Club calves are produced to be sold to participants in Future Farmers of America and 4-H who will raise and show them for educational purposes.
- 11 -
[*11] conferring with his ranch manager, petitioner sold his Maine Anjou herd and
purchased Brangus cattle, which had been developed by crossing Brahmas and
Angus cattle. They were known to thrive in heat and humidity. He added
purebred Angus cattle to the operation and hired a purebred cattle manager. All of
petitioner's Brangus and Angus cattle were registered--the Brangus with the
International Brangus Breeders Association *239 and the Angus with the American
Angus Association. Center Ranch's purebred herd operation used artificial
insemination for breeding purposes, which required constant care and supervision
of the purebred heifers in the herd. This proved to be too time intensive for
petitioner's ranch hands and was not successful; therefore, he sold his entire
purebred herd and fired the purebred cattle manager in 2006.
Later that year petitioner, for business reasons, decided to hire a new cattle
manager and began raising a commercial cattle herd to operate a cow-calf
operation, in which the product was the calf.11 Petitioner's ranch employees had
previously worked his cattle operation on horseback and continued the tradition
with the commercial cattle herd. Because Center Ranch wanted to build the size
11Commercial cattle are various breeds of cattle that are used to produce calves that are then sold when weaned for a price per pound. In contrast, feeder calves are weaned calves put on grain to gain weight, typically in a feed lot. Center Ranch planned to sell its calves when weaned and did not have a feeder calf operation.
- 12 -
[*12] of its herd, it did not sell any of its calves during the years in issue. In *240 addition a small herd of Longhorn cattle was also part of the cattle operation. The
Longhorn calves and the commercial calves were used in Center Ranch's horse
operation. Center Ranch's ranch manager estimated that it could carry a maximum
of 2,000 head of mature cattle.12 During the years in issue portions of
Headquarters and the Buffalo Creek, Trinity River, Stanmire/Riverbottom, and
Keechi Creek Divisions were used for the cattle operation.
2. Hay Operation
In 1988 petitioner began planting hay crop grasses and now grows Coastal
Bermuda grass and Tifton 85 Bermuda grass for hay crops in various pastures
across Center Ranch. The weather conditions and cattle population would dictate
which pastures were used, and if there was enough rainfall, the hayfields could be
harvested four to five times a year. Because there were abnormally high to
exceptionally high drought conditions in Leon County, Texas, during the years in
issue, in an effort to reduce costs petitioner purchased specialized equipment that
could spray herbicides at the same time the hay was fertilized. Additionally,
Center Ranch cut its fertilizer costs by 10%-12% by spreading its own fertilizer.
12This number does not include bulls and *241 calves.
- 13 -
[*13] The ranch hands who worked in the hay operation also worked in the cattle
operation.
Center Ranch had also built its own feed mill that was used for the chopping
and dry storage of the hay. The hay grown on Center Ranch was used to feed its
livestock and also to sell to third parties. Hay baled in round bales was to be fed
to cattle in the pastures, and hay baled in square bales was to be fed to horses in
stalls. Special baling equipment was purchased so that both large, one-ton-plus
round bales and 40- to 70-pound square bales could be produced on Center
Ranch's hayfields. Approximately two-thirds of the square hay bales were sold to
third parties as a cash crop. In the winter months when no hay was grown, Center
Ranch incurred feed costs for its animals. In addition to hay the horses were fed
pellets and alfalfa cubes that were purchased in bulk.
- 14 -
[*14] 3. Horse Operation13
In 1999 petitioner attended his first cutting horse show and purchased his
first cutting horses--a yearling colt and a yearling filly.14 Neither of those horses
was trained for competition. They were purchased for the ranch's working horse
herd to more efficiently work its cattle herd. In 2001 petitioner *242 purchased his first
cutting horse with the intent of showing it--a yearling mare, CR Cats Meow. She
was not trained at Center Ranch but was sent to a professional trainer. CR Cats
Meow never won a major competition and was eventually used solely in the
breeding program as a broodmare. In 2003 petitioner purchased a yearling colt,
Smart Royal Rey, to be shown. Although Smart Royal Rey did not win a major
competition, in 2006 he did tie for seventh place in the National Cutting Horse
13Some common terms in the horse industry include: (1) "foals", which are young horses, (2) "yearlings", which are horses between one and two years old,
(3) "fillies", which are young females before they have foals, (4) "mares", which are female horses, (5) "broodmares", which are mature females expecting or nursing a foal, (6) "recipient mares", which are mares ready to be bred, typically through embryo transplant, (7) "colts", which are young male horses, (8) "stallions", which are male horses and when used for breeding are referred to as "studs", and (9) "sires", which is a term for the male parent of a horse.
14A "cutting horse", although not breed specific, is typically an American quarter horse with natural *243 instincts to isolate and remove single animals from a herd. The horses are trained to cut cattle from a herd and contain and deliver them to a certain location. A cutting horse's skills are showcased by competition in timed events.
- 15 -
[*15] Association (NCHA) Futurity, the major cutting horse event.15 After Smart
Royal Rey's NCHA Futurity success, petitioner decided to train his horses at
Center Ranch in pursuit of future Futurity winners.
In 2003 petitioner began construction of the horse center, which was
completed in 2005. The horse center is a part of Headquarters; comprises seven
buildings, which includes a residence for a horse trainer; and has special barns for
stallions, 55 stalls, an arena for training the cutting horses, exercise lots, a walker,
an exercise machine, fenced paddocks, a 200-acre pasture for recipient mares, a
35-acre pasture for other mares, and a breeding facility, which operates in tandem
with the vet clinic at Center Ranch.16 See supra p. 8. All of the horse center
structures, excluding the horse trainer's residence, are utilitarian work structures.
Petitioner's expert witness valued the horse center at approximately $1,148,118.
In 2004 petitioner purchased his first *244 broodmares for a cutting horse breeding
program, purchased his last horses used for working horses on Center Ranch, and
began focusing Center Ranch's horse operation on cutting horses.
15The Futurity is for cutting horses what the Kentucky Derby is for thoroughbreds. Rounding out the cutting horse "triple crown" are the Super Stakes and the Summer Spectacular. Center Ranch entered horses in all three competitions.
16The vet clinic also has a aquatread that is used to condition horses for competition and to rehabilitate injured horses.
- 16 -
[*16] Petitioner then spent two years studying cutting horse genetics and
bloodlines in his search for a stallion to build Center Ranch's breeding program.
He studied the patterns of cutting horse registrations to learn the bloodlines of the
top cutting horses. He was looking for an outcross17 to breed with the bloodlines
of the dominant stallions in the cutting horse industry. Petitioner also consulted
cutting horse trainers, who are highly knowledgeable about and influential in the
cutting horse industry.
In late 2006 petitioner purchased his first two cutting horse stallions--Peppy
Plays for Cash and Little Peppys Ultimo. He used Peppy Plays for Cash primarily *245 for breeding cutting horse mares. Before and during the years in issue petitioner
bought and sold almost 100 horses. Some of those horses were foaled at Center
Ranch. For business reasons petitioner decided to sell many of those horses at a
loss because of their underperformance or unsuitability for next-generation
breeding traits.18 Petitioner also purchased semen and embryos obtained from
horses with the right pedigree in an attempt to upgrade the level of cutting horses
trained at Center Ranch.
17An "outcross" is a related bloodline bred with one not closely related.
18Although Peppy Plays for Cash is now too old for breeding, petitioner keeps him at Center Ranch and continues to incur costs for his care. Petitioner testified that he did not consider the other options for the horse humane.
- 17 -
[*17] Petitioner decided that for Center Ranch's cutting horse operation to be
profitable he needed to breed or purchase a major stallion. To that end he
purchased then seven-year-old stallion Woody Be Tuff in early 2008.
Petitioner's intent was for Center Ranch's horse operation to profit from
both a breeding program and showing cutting horses. A breeding program
generally includes the buying and selling *246 of stallion semen and mare embryos;
petitioner bought and sold both. It takes several years to develop a stallion into a
stud. The basis of a stallion's value as a stud is his progeny, and a stallion's foals
are not typically eligible for competition until four years after breeding.
It will take five to six years before there is credible information about a
stallion's breeding capabilities and his ability to pass on vital cutting horse traits to
his progeny. A stallion's stud fees will increase over time if his progeny are
successful. Although he was a proven stallion bringing in lifetime earnings of
over $340,000, during the years in issue Woody Be Tuff was a yet unproven stud
for a breeding program--his stud fee was no more than $1,500. But by 2013 his
stud fee had increased to $2,000 plus a chute fee,19 and by 2014 it had increased to
$5,000 plus a chute fee. As of the date of trial Woody Be Tuff's progeny had
19A "chute fee" covers the expenses of collecting a stallion's semen for artificial insemination.
- 18 -
[*18] exhibited his genetic cutting horse traits and had generated prize winnings
of over $500,000. Petitioner and Center Ranch can expect to collect semen from
Woody Be Tuff until he *247 is in his mid-20s.
Center Ranch has two of the top cutting horse trainers in the nation under
employment contract, both of whom have previously been Futurity champion
riders. Training a Futurity-level cutting horse takes several years, and the training
program required 75 calves every two weeks to train the cutting horses.20 Center
Ranch's cattle operation usually provided the calves for the cutting horse
operation. Additionally, Center Ranch consigned calves for the cutting horse
training. Although Center Ranch was paid according to the calves' weight gain
during their time at Center Ranch, those payments typically would not cover the
full cost of consigning the calves for training.
Center Ranch did most of the training, but some of its cutting horses were
sent to outside professional trainers. Cutting horse training does not begin until
the horse is two years old. The only three-year-old horses remaining in training
are those that have outstanding potential. Half of the horses bred cannot cut at
competitive levels and become work horses. Additionally, it is not uncommon for
20Calves used for the cutting horse training have to be continually changed out because once they become accustomed to being *248 around the horses they will not move.
- 19 -
[*19] horses to be injured during training. An injured or crippled horse's value is
substantially reduced and would sell for very little.
Petitioner's horses were entered into the major cutting horse competitions,
and he paid thousands of dollars in show fees each year in issue for them to
compete, which included entry fees, fees for stalls and shavings, and novice horse
fees. There were often multiple Center Ranch horses entered in any one major
show. Petitioner's horses were successful, and cutting horse competition winnings
increased each year in issue, from $19,231.31 in 2007 to $61,754.55 in 2010.21
The competition winnings are split between the owner of and the rider of the
horse.
Petitioner has invested $9,684,283.52 of his own money as capital for
Center Ranch's horse operation.22 He estimated that approximately two-thirds of
his assets and approximately 80% of his annual income are devoted to Center
Ranch. During the years in issue petitioner kept books and records for Center
Ranch, and Center Ranch had separate bank accounts.
21Center Ranch's horses had winnings of $150,901.83 in 2011. Additionally, one of Woody Be Tuff's foals from his first foal *249 crop at Center Ranch was a Futurity cochampion in 2012.
22This amount includes capital for the vet clinic that overlaps with the horse breeding at Center Ranch. See supra p. 15.
- 20 -
[*20] C. Tax Returns and the Notice of Deficiency
All of the returns for the years in issue were timely filed, and each included
a Schedule F, Profit or Loss From Farming. For 2007 petitioners reported gross
income of $1,947,824, total expenses of $4,102,617, and a loss of $2,154,793 on
the Schedule F attached to their return. The three largest expenses reported were a
depreciation and section 179 expense deduction not claimed elsewhere
(depreciation) of $860,438, labor hired of $763,339, and feed of $361,093.
For 2008 petitioners reported gross income of $1,740,903, total expenses of
$5,763,284, and a loss of $4,022,381 on the Schedule F attached to their return.
The three largest expenses reported were depreciation of $1,205,992, labor hired
of $849,352, and feed of $601,547.
For 2009 petitioners reported gross income of $1,598,824, total expenses of
$4,829,330, and a loss of $3,230,506 on the Schedule F attached to their return.
The three largest expenses reported were depreciation of $1,001,300, labor hired
of $834,434, and *250 feed of $442,858.
For 2010 petitioner reported gross income of $1,557,821, total expenses of
$4,944,260, and a loss of $3,386,439 on the Schedule F attached to his return. The
three largest expenses reported were feed of $923,712, depreciation of $921,372,
and labor hired of $757,917.
- 21 -
[*21] Respondent issued petitioners a notice of deficiency for 2007, 2008, and
2009 determining that the "activity, Schedule F - Livestock" was not engaged in
for profit, that the income reported on the Schedules F should have been reported
as "Other Income" on the returns, and that petitioners were entitled to a deduction
for expenses up to the amount of income that had been reported on the Schedules
F on Schedules A, Itemized Deductions.23 Respondent issued petitioner a notice
of deficiency for 2010 determining that the "activity, Schedule F - Livestock" was
not engaged in for profit, that the income reported on the Schedule F should have
been reported as "Other Income" on the return, and that petitioner was entitled to a
deduction for expenses up to the amount of income that had been reported on
Schedule F on Schedule A.
OPINION
I. Burden of Proof
Generally, the Commissioner's determination of a deficiency is *251 presumed
correct, and the taxpayer bears the burden of proving it incorrect. See Rule
142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, deductions are
23The Form 886-A, Explanation of Items, attached to the notice of deficiency included a statement that respondent had determined that sec. 6404(g) was applicable for 2007 and that notice was provided to petitioners on August 17, 2011. The parties did not address this issue.
- 22 -
[*22] a matter of legislative grace, and the taxpayer bears the burden of proving
his entitlement to any deductions claimed. INDOPCO, Inc. v. Commissioner, 503
U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).
Under certain circumstances the burden of proof as to factual matters may
shift to the Commissioner pursuant to section 7491(a). Petitioners did not argue
for a burden shift under section 7491(a), and the record does not establish that the
prerequisites for a burden shift have been met; therefore, the burden of proof
remains theirs.
II. Section 183
Generally, the Code allows deductions for ordinary and necessary expenses
paid or incurred in conducting a trade or business or for the production of income.
Secs. 162(a), 212(1). Under section 183, if an activity is not engaged in for profit,
then no deduction attributable to that activity is allowed except as provided for in
subsection (b).
To determine whether and to what extent *252 section 183 and the regulations
thereunder apply, the activity of the taxpayer must be ascertained. Sec. 1.183-
1(d), Income Tax Regs. After all the facts and circumstances are taken into
consideration, a taxpayer's multiple activities may be treated as one activity if the
activities are sufficiently interconnected. Id. Generally, the Commissioner will
- 23 -
[*23] accept the taxpayer's characterization of multiple activities as either a single
activity or separate activities. Id. The taxpayer's characterization will not be
accepted, however, when it appears that it is artificial and cannot be reasonably
supported by the facts and circumstances of the case. Id.
A. Whether Center Ranch's Cattle, Hay, and Horse Operations Were One Activity
Although the parties did not specifically address whether Center Ranch's
operations were one activity or separate activities, the Court will analyze the
factors from the regulations and caselaw to ascertain how many activities were
conducted on Center Ranch. After a review of all of Center Ranch's operations in
relation to the factors enumerated in the regulations and caselaw, the Court holds
that Center Ranch's operations were one activity.
1. Factors in the Regulations
Under the regulations *253 the most important factors to be considered are: (1)
the degree of organizational and economic interrelationship of the undertakings,
(2) the business purpose served by carrying on the undertakings separately or
together, and (3) the similarity of the undertakings. Id.
All of Center Ranch's operations had a high degree of organizational and
economic interrelationship. There was one ranch manager who oversaw all of its
- 24 -
[*24] operations and employees, and he reported directly to petitioner. Many
ranch hands worked in more than one of Center Ranch's operations. The staff
working out of Headquarters provided support to all of Center Ranch's operations.
All of the operations were economically intertwined, with the hay operation
providing feed for the cattle and horses and the cattle operation providing calves
for training Center Ranch's cutting horses. Petitioner also started supporting
operations at Center Ranch--such as the vet clinic and trucking operation--to
benefit the inner workings of Center Ranch and to provide for-hire services to
others. All of Center Ranch's major operations were similar in that they were
common operations to be performed on a working ranch in Texas. While it would
be *254 possible to operate a ranch with only one of the three major operations, it would
not be uncommon for other ranches to have the same operations as Center Ranch.
The operations of Center Ranch meet all of the factors in the regulations to be one
activity.
2. Caselaw Factors
In addition to the factors in the regulations, the Court considers the
following factors: (1) whether the activities are conducted at the same place; (2)
whether the activities were part of the taxpayer's efforts to find sources of revenue
from his land; (3) whether the activities were formed separately; (4) whether one
- 25 -
[*25] activity benefited from the other; (5) whether the taxpayer used one activity
to advertise the other; (6) the degree to which the activities shared management;
(7) the degree to which one caretaker oversaw the assets of both activities; (8)
whether the taxpayer used the same accountant for the activities; and (9) the
degree to which the activities shared books and records. See Topping v.
Commissioner, T.C. Memo. 2007-92, slip op. at 15 (citing Mitchell v.
Commissioner, T.C. Memo. 2006-145, slip op. at 10-11).
The cattle, hay, and horse operations were all conducted on Center Ranch's
8,700 acres. The cattle and hay operations were spread over seven of the
noncontiguous tracts *255 of Center Ranch's land, and the horse operation was on
Headquarters acreage. Center Ranch lands were used as a source of revenue. The
cattle and horses grazed and were trained on Center Ranch's acreage, and the hay
grown as a cash crop was sold to third parties. Although the three major Center
Ranch operations did not all begin at the same time, they were each natural
outgrowths of the use of Center Ranch lands.
All of Center Ranch's operations were interrelated. The cattle and horse
operations both benefited from the hay operation because it provided feed for the
animals. The horse operation also benefited from the cattle operation because the
cattle operation provided calves for the cutting horse training. The ranch manager
- 26 -
[*26] oversaw all of Center Ranch's operations, with the cattle manager, horse
managers, and trainers reporting to him. He also was the caretaker of each
operation's assets. Petitioner kept books and records for each operation that were
combined as the books and records for Center Ranch.
The Court also notes that for each of the years in issue petitioner attached to
his return a single Schedule F reporting Center Ranch's income and expenses,
which indicated that he considered *256 Center Ranch's operations one activity. After
a review of all of the facts and circumstances and the factors in the regulations and
caselaw, the Court finds that Center Ranch's cattle, hay, and horse operations were
conducted as a single activity for the years in issue.
B. Whether the Activity Was Engaged In for Profit
Now that petitioners' activity for the years in issue has been ascertained, see
sec. 1.183-1(d), Income Tax Regs., the Court must decide whether the activity was
engaged in for profit. To decide whether a taxpayer is carrying on a trade or
business so that his expenses are deductible under section 162, the Court examines
whether the taxpayer's primary purpose and intention in engaging in the activity is
to make a profit. Dreicer v. Commissioner, 78 T.C. 642, 643 (1982), aff'd without
published opinion, 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of
profit need not be a reasonable one, but merely bona fide. Id.; sec. 1.183-2(a),
- 27 -
[*27] Income Tax Regs. Whether a taxpayer expects to realize a profit is a
question of fact and is resolved by examining all of the facts and circumstances of
the case. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Dreicer v.
Commissioner, 78 T.C. at 643-644; sec. 1.183-2(a), Income Tax Regs.
The Court examines the facts and circumstances of the case using the
relevant nonexclusive factors in section 1.183-2(b), Income Tax Regs.Dreicer v.
Commissioner, 78 T.C. at 644. Those factors include: (1) the manner in which
the *257 taxpayer carries on the activity, (2) the expertise of the taxpayer or his
advisors, (3) the time and effort expended by the taxpayer in carrying on the
activity, (4) the expectation that assets used in the activity may appreciate in value,
(5) the success of the taxpayer in carrying on other similar or dissimilar activities,
(6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. No one factor is determinative. Id. After a thorough review of the facts and circumstances, the Court finds that Center Ranch was a for-profit activity, and the relevant facts and circumstances will be discussed infra.
- 28 -
[*28] 1. The Manner in Which the Taxpayer Carries On the Activity
Center Ranch's activity was carried on in a businesslike manner. Petitioner
kept books and records for each of Center Ranch's operations to determine their
incomes and expenses. Indeed, petitioner used resources from his other
endeavors--namely, Welch Consulting--to keep track of such information.
Respondent tried to make much of the *258 fact that there were mistakes in petitioner's
books and records. The fact that there were some mistakes in the books and
records of a multimillion-dollar activity does not negate that the activity was
carried on in a businesslike manner.24 Center Ranch also had separate bank
accounts, which is indicative of an activity being carried on in a businesslike
manner. See Wayts v. Commissioner, T.C. Memo. 1992-82, 63 T.C.M. (CCH)
2032, 2034 (1992) (finding horse racing and breeding activity was carried on in a
businesslike manner because it had a separate bank account) (citing Pryor v.
Commissioner, T.C. Memo. 1991-109); Hopcus v. Commissioner, T.C. Memo.
1988-181, 55 T.C.M. (CCH) 717, 719 (1988) (finding horse breeding and
24Respondent argued that one such mistake--petitioner's inability to allocate overhead costs of each operation--made clear that Center Ranch was not carried on in a businesslike manner. Because the Court finds that Center Ranch's operations were one activity, the allocation of overhead costs between operations, e.g., salaries of ranch hands who worked in both the hay and cattle operations, is of little concern.
- 29 -
[*29] boarding activity was carried on in a businesslike manner because it had a
separate bank account); cf. Faust v. Commissioner, T.C. Memo. 2011-158, 102
T.C.M. (CCH) 16, 17-18 (2011) (finding horse activity was not carried on in *259 a
businesslike manner because it did not have a separate bank account).
Respondent also argued that petitioner had no written business plan for
Center Ranch. The fact that petitioner had no written business plan does not
negate a profit motive. Petitioner's business plan was evidenced by his actions.
See Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *16 (stating that written
financial plan not required for 32-horse farm where business plan was evidenced
by action (citing Phillips v. Commissioner, T.C. Memo. 1997-128, 73 T.C.M.
(CCH) 2296, 2300 (1997))). Indeed, petitioner did not have a written business
plan for any of his endeavors, many of which have been highly profitable.
Petitioner also made changes in the activity when he realized that certain
operations would not be profitable. These changes were business decisions.
Petitioner changed Center Ranch's cattle operation three times--from club calves,
to purebreeds, to a commercial cattle herd--when he realized that a particular cattle
operation would not be profitable.
He also added other operations to Center Ranch when the third-party fees
for those operations became too costly. Petitioner built the vet clinic when he
- 30 -
[*30] realized he could contract a full-time veterinarian for less than the fees he
was paying to outside veterinarians. *260 He also reduced shipping expenses when he
added a trucking operation to Center Ranch to haul his own cattle and hay. Those
additional operations required substantial capital investment but also reduced
variable costs; both of those operations also brought more income to Center Ranch
because their services were offered to third parties for a fee. Center Ranch
advertised its operations and services through its website and its Facebook page
and in online cutting horse directories.
Additionally, the Court finds that Center Ranch was operated in a
businesslike manner because of its size and vertical integration. Center Ranch
comprises over 8,700 acres in Leon County, Texas, outside of the town of
Centerville. It was a well-known and well-regarded working ranch that employed
25 people full time during the years in issue and hired part-time ranch hands when
needed. Center Ranch paid some of its employees wages above the county's
median wage in its effort to retain the best ranch manager, cattle and horse
managers, horse trainers, and ranch hands in the area.
Center Ranch's operations were vertically integrated. The hay operation
provided feed to the cattle and horse operations. The cattle operation provided *261 calves to the cutting horse operation for training. The vet clinic and trucking
- 31 -
[*31] operation provided necessary services to Center Ranch and to outside parties
for a fee. The integration of all of Center Ranch's operations came about as
petitioner decided how to operate the ranch more efficiently and to bring in
additional income. All of these decisions were business decisions and were not
merely made on the basis of petitioner's whim or fancy.
This factor favors petitioner's argument that Center Ranch was a for-profit
activity for the years in issue.
2. Expertise of the Taxpayer or His Advisers
Petitioner has been involved with agriculture since his middle school days
and with agricultural economics since college. His time in agricultural pursuits
alone would give him the professional expertise necessary to oversee a working
ranch. Petitioner also subscribed to 20 professional journals that discussed
ranching, cattle, and horses. Petitioner hired professionals to manage Center
Ranch and contracted with professionals to train its horses, having as many as five
managers and trainers during any of the years in issue. Additionally, petitioner
had licensed veterinarians at Center Ranch. A profit *262 motive may be indicated if a
taxpayer "employs competent and qualified persons to carry on the activity." Sec.
1.183-2(b)(3), Income Tax Regs.
- 32 -
[*32] The ranch manager had been involved with ranching almost his entire
professional career, and petitioner contracted with the top two cutting horse
trainers in the country to train Center Ranch's cutting horses. When petitioner
decided to raise purebred cattle on Center Ranch, he hired a cattle manager who
was familiar with purebred stock. When petitioner decided, for business reasons,
to change the makeup of his cattle herd, he discharged the purebred cattle manager
because his expertise was no longer needed. Petitioner then hired a cattle manager
familiar with managing a commercial cattle herd. Petitioner consistently
surrounded himself with competent managers, trainers, and ranch hands so that
Center Ranch operated in a businesslike manner.
This factor favors petitioner's argument that Center Ranch was a for-profit
activity for the years in issue.
3. The Taxpayer's Time and Effort Expended in Carrying On the Activity
Respondent argues that petitioner did not spend a significant amount of his
time and effort on Center Ranch for it to be a for-profit activity because he was
only *263 at the ranch on the weekends. Petitioner's weekends at Center Ranch and
daily communications with his ranch managers can be sufficient to demonstrate a
profit motive. See Givens v. Commissioner, T.C. Memo. 1989-529, 58 T.C.M.
- 33 -
[*33] (CCH) 255, 259 (1989). Petitioner was at Center Ranch for at least three
full days of each week--Friday, Saturday, and Sunday--for the years in issue.25 For
the other four days of the week, petitioner was devoting time to Welch Consulting
and his other endeavors. That meant petitioner spent slightly less than half of each
week at Center Ranch. While at Center Ranch petitioner met with the ranch
manager to discuss and visually inspect Center Ranch's operations. He also spoke
with the ranch manager daily and with the cattle and horse managers regularly--all
of them full-time ranch employees--when away from Center Ranch.
Additionally, petitioner employed other full-time and part-time employees
to help operate Center Ranch. During the years in issue there were 25 full-time
employees and several part-time ranch hands employed at Center Ranch. The full-
time employees' annual salaries ranged from $25,000 to $115,000. The
employment of "competent and qualified persons" to carry on an activity when the
taxpayer's *264 time devoted to the activity is limited can indicate a profit motive. Sec.
1.183-2(b)(3), Income Tax Regs.; see Annuzzi v. Commissioner, T.C. Memo.
2014-233; McNaught v. Commissioner, T.C. Memo. 1999-25; Dawson v.
Commissioner, T.C. Memo. 1996-417, 72 T.C.M. (CCH) 624 (1996).
25Sundays were generally quiet at Center Ranch. See supra p. 4.
- 34 -
[*34] Petitioner expended significant time and effort--by himself and through his
employees--to make Center Ranch a for-profit activity. This factor favors his
argument that Center Ranch was a for-profit activity for the years in issue.
4. Expectation That the Activity's Assets May Appreciate
"The term 'profit' encompasses appreciation in the value of assets, such as
land, used in the activity." Sec. 1.183-2(b)(4), Income Tax Regs. Petitioner
argues that he fully expected Center Ranch's land, cattle, and horses to all
appreciate and entered into evidence expert witness reports for each.
Respondent's only argument is that the land, cattle, and horses would not
appreciate as much as petitioner and his experts argue that they would.
An expert witness' opinion is admissible if it assists the trier of fact to
understand the evidence or determine a fact in issue. Fed. R. Evid. 702. The
Court evaluates an expert's opinion in light of his qualifications and the evidence
in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). The Court
may accept an expert's opinion in its entirety *265 or be selective as to the portions it
finds reliable. See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938);
Parker v. Commissioner, 86 T.C. at 561-562; Buffalo Tool & Die Mfg. Co. v.
Commissioner, 74 T.C. 441, 452 (1980). The Court finds petitioner's real
property expert witness and his report credible.
- 35 -
[*35] Respondent and petitioner agree that Center Ranch land was purchased to
be used as working ranch land--not primarily with the intent to profit from its
increase in value--making the holding of the land and the farming one activity.26
Seesec. 1.183-1(d), Income Tax Regs. Respondent disputes petitioner's valuation
of Center Ranch land but offers no expert witness of his own.
The same is true of petitioner's cattle and horse operations--respondent does
not dispute that the operations would appreciate, only that petitioner's valuations
are incorrect. While respondent offers no expert witnesses of his own, he is
correct in part that petitioner's expert witness reports for Center Ranch's horse and
cattle operations were valued incorrectly. Both reports included the values of
horse and cattle that were not a part of Center Ranch's herds during the years in
issue. The Court will exclude those values. The Court also finds reliable the
expert witness reports for Center Ranch's cattle and horse operations.
Respondent argues that petitioner must *266 have a profit motive that expects
recoupment of all of Center Ranch's past losses. This expectation is too much.
26This does not include the 320 acres of Coker Place Division or the 20 acres in Centerville on which the duplexes were located. Petitioner testified that Coker Place was purchased primarily for investment purposes. Although the Court finds credible petitioner's testimony that the duplexes were used to house ranch hands when necessary, they were also available for rent when no ranch hands were staying there. Therefore, the duplexes had an income stream that was reported separate and apart from the Center Ranch activity.
- 36 -
[*36] "An overall profit is present if net earnings and appreciation are sufficient to
recoup the losses sustained in the 'intervening years' between a given tax year and
the time at which future profits were expected." Helmick v. Commissioner, T.C.
Memo. 2009-220, 98 T.C.M. (CCH) 269, 275 (2009) (citing Bessenyey v.
Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967)).
Therefore, the question is not whether petitioner would recoup all of Center
Ranch's losses but whether he would recoup the losses between the years in issue
and the "hoped-for profitable future." See id. The Court finds that petitioner's
expectation of an overall profit *267 could be realized with the expectation of the
appreciation of Center Ranch assets and the value of capital improvements made
on Center Ranch lands.
The Court finds that this factor favors petitioner's argument that Center
Ranch was a for-profit activity during the years in issue.
5. The Taxpayer's Success in Carrying On Similar or Dissimilar Activities
Petitioner has been successful in other professional areas. He built Welch
Consulting into a multimillion-dollar consulting firm and was an economics
professor for 40 years, teaching at more than one esteemed university. He also
was a partner in a successful software company and incorporated a research
- 37 -
[*37] corporation, of which he is still a manager. In his other professional
pursuits, petitioner has also made changes and adaptations when needed for
business reasons, even ending one pursuit altogether when it was apparent that it
would not be profitable. While petitioner has been successful in other endeavors,
there is little interplay between his consulting and software businesses and his
ranch activity. See Annuzzi v. Commissioner, T.C. Memo. 2014-233.
Because petitioner's success was in dissimilar activities, the Court finds this
factor to be neutral.
6. The Taxpayer's History of Income *268 and Losses With Respect to the Activity and the Amount of Occasional Profits, If Any, Which Are Earned
The parties agree to, and therefore did not brief, the facts that petitioner
derived no occasional profits from Center Ranch and that it had reported losses for
every year in issue. Although it was not briefed by the parties, a short discussion
of Center Ranch's gross income and losses is pertinent.
Center Ranch generated millions of dollars of gross income for each year in
issue. Indeed, Center Ranch's income has increased almost every year of its
existence. But the steady increase in expenses and in capital investment
accompanying this steady income growth has resulted in yearly losses.
- 38 -
[*38] Nevertheless, the years in issue included the startup phases of both the horse
operation and the cattle operation, which is discussed in more detail infra.
The startup phase for a horse-related activity is 5 to 10 years. Engdahl v.
Commissioner, 72 T.C. 659, 669 (1979). Additionally, horse breeding and
performance are speculative activities, with the opportunity for substantial income
at every competition or purchase of the right stallion for breeding. See Chandler
v. Commissioner, T.C. Memo. 2010-92, 99 T.C.M. (CCH) 1376, 1379 (2010),
aff'd, 481 F. App'x 400 (9th Cir. 2012); see also Dawson v. Commissioner *269 , 72
T.C.M. (CCH) at 627 (finding that a taxpayer's belief that a champion horse could
generate substantial profits supported the existence of a profit motive). Although
petitioner purchased his first cutting horses in 1999, those horses were not
purchased to show or breed. It was not until 2001 that petitioner purchased his
first cutting horse to be shown. He began construction of Center Ranch's horse
center and vet clinic in 2003. Petitioner testified that he did not shift Center
Ranch's focus to cutting horses until 2004, and it was not until 2006 that he
purchased his first stallion for breeding. Petitioner did not purchase Woody Be
Tuff, a major cutting horse stallion, to breed until 2008, one of the years in issue.
The parties stipulated that it takes five to six years to have credible
information about a stallion's breeding capabilities; thus during the years in issue,
- 39 -
[*39] Woody Be Tuff's breeding capabilities were speculative. Indeed, Woody Be
Tuff's breeding fees steadily increased after the years in issue. In 2013 his
breeding fee was $2,000 plus a chute fee, and in 2014 it had increased to $5,000
plus a chute fee.
Although petitioner testified that he did not focus Center Ranch's *270 horse
operation on cutting horses until 2004, the Court finds that petitioner's cutting
horse operation began in 2003 with the construction of the horse center and vet
clinic. See Roberts v. Commissioner, 820 F.3d 247 (7th Cir. 2016) (finding that
taxpayer's for-profit horse activity started with the decision to build a "bigger and
better horse training facility"), aff'g in part and rev'g in partT.C. Memo. 2014-74.
Additionally, Center Ranch's prize winnings from showing its horses increased
from a little more than $19,000 in 2007 to over $61,000 in 2010. All of the years
in issue--2007, 2008, 2009, and 2010--fall within the usual startup phase for a
horse operation.27 See Engdahl v. Commissioner, 72 T.C. at 669. In this highly
27Respondent argues that it is not possible to have a profit motive when generating millions of dollars of losses. Because the Court finds that the horse operation was in its startup phase during the years in issue, it need not address at length respondent's argument. But the Court will note that a taxpayer's suffering years of multimillion-dollar losses beyond an activity's startup phase does not bar a profit motive. See, e.g., Metz v. Commissioner, T.C. Memo. 2015-54.
- 40 -
[*40] speculative activity, petitioner is slowly and steadily working towards a
highly profitable cutting horse operation.
The Court finds that *271 petitioner began his commercial cattle operation in
2006. Although Center Ranch had previously operated club calf and purebred
cattle operations, both of those operations--most notably the purebred operation--
were more labor and time intensive than petitioner intended. Indeed, petitioner
credibly testified that artificially inseminating the purebred heifers required
extensive individual time and attention for each of the animals and obligated too
much of his ranch hands' time. Center Ranch's wholesale change to a new type of
cattle operation restarted the clock for the startup period for that operation. Cf.
Mathis v. Commissioner, T.C. Memo. 2013-294 (finding that a change in focus to
breeding from training cutting horses did not amount to a new activity). The
change to a new type of cattle operation was a business decision that required a
new cattle manager and a complete turnover of Center Ranch's cattle herd.
Therefore, Center Ranch's commercial cattle operation was also in its startup
phase. See Burrus v. Commissioner, T.C. Memo. 2003-285, 86 T.C.M. (CCH)
429, 438 (2003) (finding that losses incurred in the first six years of a cattle
activity were during the startup phase of the activity (citing Fields v.
Commissioner, T.C. Memo. 1981-550)).
- 41 -
[*41] Although Center Ranch has sustained continued *272 losses and had no
occasional profits, the years in issue were during both the cattle and horse
operations' startup phases. Therefore, the Court finds that the activity's history of
income and losses and the amount of occasional profits, if any, favor respondent,
but it will not give these factors as much weight because the cattle and horse
operations were in their startup phases during the years in issue.
7. The Taxpayer's Financial Status and Elements of Personal Pleasure and Recreation
Petitioners did have substantial wealth and financial resources not related to
Center Ranch. Indeed, petitioner contributed over $9 million of his own money
for Center Ranch's capital. But wealth not associated with the activity in issue is
not a bar to that activity's being engaged in for profit. See Blackwell v.
Commissioner, T.C. Memo. 2011-188, 102 T.C.M. (CCH) 137, 143 (2011).
Additionally, the receipt of tax benefits standing alone does not establish the lack
of a profit motive. See Engdahl v. Commissioner, 72 T.C. at 670. This, coupled
with the fact that the injuries petitioner sustained in an automobile accident when
he was in college substantially restricted his ability to derive personal pleasure
from Center Ranch's outdoor operations--he performed no manual labor on the
ranch, did not ride the *273 ranch's horses, and did only a little hunting in the late
- 42 -
[*42] 1980s--does not impede the Court's finding that Center Ranch was operated
for profit.
The Court finds petitioner's financial status and elements of personal
pleasure or recreation to be neutral factors.
III. Conclusion
After a review of all of the facts and circumstances and for the reasons
stated above, the Court finds that petitioner was engaged in Center Ranch as a for-
profit activity during the years in issue. In so holding, the Court is not declaring
Center Ranch a for-profit activity ad infinitum. If Center Ranch's future losses
cannot be reined in, petitioner may again find his profit motives before this Court.
The Court has considered all of the arguments made by the parties, and to
the extent they are not addressed herein, they are considered unnecessary, moot,
irrelevant, or without merit.
To reflect the foregoing,
Decision will be entered
for petitioners.